899 So.2d 823 (2005)
David E. BOONE, Plaintiff-Appellee
v.
Peggy H. BOONE, Defendant-Appellant.
No. 39,544-CA.
Court of Appeal of Louisiana, Second Circuit.
April 6, 2005.
*824 Onebane Law Firm by Frank H. Spruiell, Jr., Shreveport, for Appellant.
James L. Fortson, Jr., Shreveport, for Appellee.
Before BROWN, MOORE and LOLLEY, JJ.
MOORE, J.
Peggy H. Boone filed suit to partition shareholder distributions received by her former husband, David E. Boone, from a community-owned Subchapter "S" corporation. The district court found that distributions received after the termination of community were actually earnings and not subject to the partition claim. Peggy appeals; for the reasons expressed, we affirm.

Procedural Background
Peggy and David were married in 1979 without a prenuptial agreement. They formed Boone Oilfield Consulting Inc. as a Subchapter "S" corporation in 1994. David filed for divorce on March 8, 1999, and the subsequent judgment terminated their community effective that date. A judgment on rule in September 2000 partitioned all community assets except the stock of Boone Oilfield Consulting. David ran the corporation until December 31, 2000.
After March 8, 1999, the corporation continued to pay David a salary and shareholder distributions. David's declared salary for 1999 was $51,624.32; for 2000, $55,000.00. His post-dissolution shareholder distributions totaled $134,584.66 in 1999, $285,558.00 in 2000, and $98,697.00 in 2001 (based on retained earnings from 2000). David used his distributions to pay debts of the former community totaling $3,176.48. After March 8, 1999, the corporation made no distributions to Peggy.
*825 In July 2002, Peggy filed the instant petition to partition their community; by sworn descriptive list filed in July 2003, she claimed as community assets "shareholder distributions of Boone Oilfield Consulting to David E. Boone following termination of the community property regime on March 8, 1999." David traversed the list, urging that these payments "were for work performed subsequent to [March 8, 1999] and are not community property."

Trial Evidence
At trial in January 2004, the parties filed 23 stipulations, mostly setting out the facts summarized above. Peggy offered the testimony of three CPAs. The first, Daniel Carpenter, had prepared David's individual tax returns in 1999 and 2000, as well as the corporation's tax return in 2000. He explained that the advantage of Subchapter "S" status is that profits and losses are not taxed at the corporate level, but rather to the individual shareholders who receive income or distributions. He acknowledged, however, the added benefit of compensating shareholders by paying them distributions instead of salaries, thus avoiding payroll taxes. On cross examination, he admitted that all distributions to David were the result of his expertise and labor.
Peggy's next CPA was her brother, Lonnie Hardy, who had prepared the couple's joint returns, as well as the corporation's, for many years. He "questioned the propriety" of allocating no shareholder distributions to Peggy after the termination of community, but admitted knowing little about the corporation's activities after the couple separated. He also admitted that Subchapter "S" corporations are commonly used to minimize employment taxes.
Peggy's final witness was Thomas Youngblood, a CPA retained for this case. He testified that because the corporation was an unpartitioned community asset, Peggy was entitled to 50% of all corporate income or distributions paid since the termination of community. He calculated her share as $257,831.59. On cross examination, he acknowledged that "federal tax regulations are not determinant in the characterization of income with respect to Louisiana community property laws."
David testified that he was a "drilling and completion consultant" and the sole shareholder in Boone Oilfield Consulting. He explained that the corporation had no capital assets; its only product was his own advice. He admitted that he hired subcontractors who performed the actual oilfield labor, but maintained that he supervised them directly.
David also offered the testimony of a CPA, Susan Whitelaw, to establish that he had drawn wages from the corporation in the years prior to the termination of community.
David's main witness was Deryl Medlin, an "expert board-certified tax attorney." Mr. Medlin reiterated the purposes and benefits of Subchapter "S" status, noting that the IRS usually did not contest shareholder distributions in lieu of wages as long as the corporation paid reasonable wages. Over strong objection, he testified that "civil fruits" do not alter the underlying asset; in Boone Oilfield Consulting, all assets arose from David's effort, skill and industry; distributing these assets would deplete the corporation. He therefore concluded that the distributions were not civil fruits, but earnings. He admitted that in different circumstances, corporate distributions could be civil fruits.

Action of the District Court
The court acknowledged, "The narrow issue in this case is whether these distributions should be considered `fruits' flowing from Peggy's co-ownership of the former *826 community stock in Boone Oilfield Consulting or `earnings' resulting primarily from the skill, industry and labor of David subsequent to the termination of the community." After stating both sides' positions, the court cited Paxton v. Bramlette, 228 So.2d 161 (La.App. 3 Cir.1969), writs ref'd, 255 La. 241, 230 So.2d 92 (1970), as adopting the "ratio of labor to capital approach for making the ultimate conclusion." The court accepted Mr. Medlin's expert opinion that this approach was sound, as well as his view that all post-community distributions to David "were in the nature of income produced by the labor, skill and industry of David." Thus, the court found, the distributions were earnings, and not civil fruits. Finally, the court noted that tax regulations affecting Subchapter "S" corporations "are not the determinant in the characterization of income with respect to Louisiana property laws." McKneely v. McKneely, 98-2472 (La.App. 1 Cir. 6/14/00), 764 So.2d 1157. The court rendered judgment awarding Peggy $33,032.59, based on David's stipulated pre-termination earnings, less stipulated credits.
Peggy has appealed, advancing two assignments of error.

Discussion
By her first assignment of error, Peggy urges the district court erred in classifying shareholder distributions as earnings. As a prefatory issue, she contends that the classification of property is a purely legal matter, subject to de novo review without deference to the district court's findings. In support she cites State v. Smith, 99-2015 (La.7/6/00), 766 So.2d 501 and City of New Orleans v. Board of Comm'rs, 93-0690 (La.7/5/94), 640 So.2d 237. In those cases, the supreme court reviewed de novo a finding of constitutional vagueness and an exception of no cause of action. Neither case involved the classification of property as community or separate; in cases where classification is the issue, courts hold that this determination is factual and subject to manifest error review. Ross v. Ross, 2002-2984 (La.10/21/03), p. 18, 857 So.2d 384, at 395; Sims v. Sims, 28,470 (La.App. 2 Cir. 6/26/96), 677 So.2d 663. In the instant case, the judgment was plainly based on factual findings to which we will apply the manifest error rule.
On the merits, Peggy contends that once the community regime terminated, statutory provisions governing co-ownership applied to the former community property. La. C.C. arts. 2369.1, 2369.2.[1] Specifically, she urges that as owner of one-half of the stock in Boone Oilfield Consulting, she was also the owner of the fruits and products of her one-half interest. La. C.C. arts. 2369.2, 483.[2] She shows that "civil fruits" are "revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions." La. C.C. art. 551. She concedes that La. C.C. art. 552,[3] specifically *827 addressing corporate distributions, is not precisely on point, as it defines the rights of a usufructuary vis-à-vis a naked owner, but submits that because the instant case involves no usufruct, the distinction is irrelevant. She also argues that the court erred in adopting the analysis of Paxton v. Bramlette, supra, as that case involved true community property, and not purely co-owned property as in the instant case. In the alternative, she contends that even if the "ratio of capital to labor" approach applied, the court erred because the corporation's income resulted not only from David's labor, but mostly from that of third-party contractors, and David controlled how much of the corporation's income could be designated as a distribution instead of a salary. Finally, she raises the policy consideration that courts should not be required to weigh extraneous evidence to determine whether corporate distributions are earnings or fruits, and that the instant decision could have a devastating impact on passive co-owners, whether or not they were previously married.
Indisputably, the laws of co-ownership apply to former community property; however, there are threshold issues of burden of proof and classification. According to La. C.C. art. 2340:
Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate.
The distributions at issue came into David's possession after the termination of community and do not carry the presumption of community. Lanza v. Lanza, XXXX-XXXX (La.3/2/05), 898 So.2d 280. The burden therefore fell to Peggy to prove the distributions were community assets. According to La. C.C. art. 2338:
The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; * * * and all other property not classified by law as separate.
By implication, wages earned by a spouse for work performed after the termination of the community are separate property. Lanza v. Lanza, supra.
Simply put, the issue was whether the distributions received by David after the termination of the community were more in the nature of "revenues derived by operation of law" or the product of David's "effort, skill, or industry." Contrary to Peggy's position, the rationale of Paxton v. Bramlette, supra, is sound. The supreme court recently approved it in Ross v. Ross, supra, as has this court in Kyson v. Kyson, 596 So.2d 1308 (La.App. 2 Cir.1991), writ denied, 599 So.2d 314 (1992), and the third circuit in Gautreau v. Gautreau, 96-1548 (La.App. 3 Cir. 6/18/97), 697 So.2d 1339, writ denied, 97-1939 (La.11/7/97), 703 So.2d 1272. Admittedly, the sequence of events in Paxton, Ross, Kyson and Gautreau was the inverse of those herein. Those cases involved separate assets (stock in Paxton and Gautreau, rental property in Kyson, insurance policies in Ross) that yielded income (corporate distributions, rents, policy renewals) during a marriage, subject to matrimonial agreements to retain the fruits of separate assets as separate property. If the income was found to be civil fruits, it remained separate; if the result of the owner's effort, skill or industry, it went to the community. *828 In the instant case, inversely, the property (stock) was community and generated income (corporate distributions) after the termination of the community. Nevertheless, the issue is the same: whether the income is civil fruits or earnings. The court in Ross closely analyzed the evidence to determine that the renewal premiums were not civil fruits of the separate insurance policies, but resulted from Mr. Ross's labor.
A similar analysis in the instant case fully supports the district court's finding. David testified that the corporation had no capital assets, and its only product was his own advice to clients. The corporation's former CPA, Mr. Carpenter, testifying on Peggy's behalf, corroborated that it was a consulting business with no significant assets or capital investment; its income was generated solely by David's expertise in the field. Peggy's CPA and brother, Lonnie Hardy, did not seriously dispute Mr. Carpenter's assessment. Peggy's most emphatic witness, Mr. Youngblood, admitted making many assumptions about the case but never indicated he had any knowledge of how the corporation made its money. All witnesses agreed that just because payments were labeled "corporate distributions" did not determine their true nature. On this evidence, the district court was entitled to find that the "corporate distributions" were income resulting exclusively from David's effort, skill or industry, and not civil fruits derived by juridical act.
Peggy further argues that the corporation's income cannot be ascribed to David because most of the actual labor was performed by third party contractors. She shows that in 2000, Boone Oilfield Consulting had revenues of $1,839,817 and paid contract labor expenses of $1,215,195. The supreme court, however, rejected a similar argument in Ross:
In his testimony, Mr. Ross describes his work as office management and training employees. The fact that Mr. Ross's role at some point changed from direct sales to a supervisory role, does not change this court's decision. The employees were mandataries or agents, acting on behalf of the agency servicing old clients and prospecting for new clients. Any servicing by employees equates to servicing by Mr. Ross himself. * * *
We find it inconceivable that Mr. Ross would spend such a significant amount of time "working" at his office, producing substantial income mostly attributable to renewal commissions, and then assert that he did not exert any effort, skill or industry toward producing the renewal commissions. Mr. Ross's assertions in this regard are simply unconvincing.
Ross v. Ross, supra at p. 21, 857 So.2d at 384 (emphasis added).
In the instant case, David retained and supervised the independent contractors, bearing responsibility for their work. Their execution of his instructions equates to his own effort, skill or industry.
Finally, we are unpersuaded by Peggy's argument that the principles of community property are inapplicable to the case, and only those of co-ownership should apply. Unlike ordinary co-owners, former spouses with former community property are subject to, inter alia, a duty to preserve, restrictions against alienation, encumbrance or lease, and special rules governing partition. La. C.C. arts. 2369.3, 2369.4; La. R.S. 9:2801. We decline Peggy's invitation to disregard the fact that the stock was formerly community property. Her first assignment of error lacks merit.

*829 Expert Testimony

By her second assignment, Peggy urges the district court improperly relied on the testimony of Deryl Medlin. She argues that although he was properly accepted as an expert in the field of "being a board-certified tax attorney" and "licensed to practice law in the State of Louisiana," he had no expertise in family law or community property law. Specifically, she contests Mr. Medlin's opinion that the funds in dispute were income produced by David's effort, skill or industry. She concedes that an expert's testimony is "not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact," La. C.E. art. 704, but argues that Mr. Medlin's opinion was beyond his "knowledge, skill, experience, training, or education" and could not "assist the trier of fact to understand the evidence or to determine a fact at issue." La. C.E. art. 702.
David responds that the district court has broad discretion to weigh and accept or reject expert testimony; the importance of such testimony is largely dependent on the expert's qualifications and the facts that underlie his opinion. Bolton v. Louisiana State Univ. Med. Center, 601 So.2d 677 (La.App. 2 Cir.1992). He submits that the district court did not abuse its broad discretion.
The threshold question, of course, is whether the expert testimony will assist the trier of fact. Article 702 contemplates testimony regarding "scientific, technical, or other specialized knowledge" which is beyond the understanding of the average factfinder. We agree with Peggy's impression that a Louisiana district court should not need expert opinion to inform itself about community property law; the arguments of counsel should suffice. Some cases have refused to allow attorneys to testify as experts regarding matters of domestic law. Martello v. Town of Ferriday, XXXX-XXXX (La.App. 3 Cir. 3/6/02), 813 So.2d 467, writs denied, XXXX-XXXX, 1514 (La.6/7/02), 818 So.2d 770, 771, cert. denied, 537 U.S. 1072, 123 S.Ct. 673, 154 L.Ed.2d 566 (2002); Morrison v. Johnston, 571 So.2d 788 (La.App. 2 Cir.1990), writ denied, 575 So.2d 367 (1991). At least one case, however, has allowed it. State v. Francis, 546 So.2d 1357 (La.App. 4 Cir.), writ denied, 551 So.2d 1336 (1989). All these cases, however, uphold the district court's discretion as to the admissibility and weight of the expert testimony. This accords with the general rule that credibility determinations, including the evaluation and resolution of conflicts and expert testimony, are factual issues to be resolved by the trier of fact. Lasyone v. Kansas Southern R., 2000-2628 (La.4/3/01), 786 So.2d 682. Although the call is a close one, we will defer to the district court's discretion.
Moreover, David testified, and Mr. Carpenter corroborated, that the corporation had no capital assets to generate income, but relied solely on the effort, skill or industry of David. This was sufficient, without Mr. Medlin's opinion, to support the district court's finding. Even if Mr. Medlin's opinion as to legal issues was improper, the record will otherwise support the court's judgment. This assignment of error lacks merit.

Conclusion
For the reasons expressed, the judgment is affirmed. Costs are charged to the appellee, Peggy H. Boone.
AFFIRMED.
NOTES
[1] Article 2369.1 provides, in pertinent part: "After termination of the community property regime, the provisions governing co-ownership apply to former community property, unless otherwise provided by law or by juridical act." Article 2369.2 provides: "Each spouse owns an undivided one-half interest in former community property and its fruits and products."
[2] Article 483 provides: "In the absence of rights of other persons, the owner of a thing acquired the ownership of its natural and civil fruits."
[3] Article 552 provides: "A cash dividend declared during the existence of the usufruct belongs to the usufructuary. A liquidation dividend or a stock redemption payment belongs to the usufruct.

"Stock dividends and stock splits declared during the existence of the usufruct belong to the naked owner subject to the usufruct.
"A stock warrant and a subscription right declared during the existence of the usufruct belong to the naked owner free of the usufruct."