PITMAN, J.
Concerning the division of property after divorce between Plaintiff Melodye Patterson, nee Tanner, and Defendant Gary Edward Patterson, Plaintiff appeals the judgment of the trial court which declared their matrimonial agreement ("the Agreement") valid and which classified the shares of a company owned by Plaintiff prior to the marriage as community property. For the following reasons, we affirm the judgment of the trial court.
FACTS
Plaintiff and Defendant were involved in a relationship in 1988 while Defendant was still married to his first wife. In 1988, Plaintiff formed a company called Financial Resources Management of Louisiana, Inc. ("FRM"), and is its sole shareholder. Between 1988 and 1990, Plaintiff purchased three tracts of immovable property through FRM known as the Heard tract, the DeSoto tract and the Caney Lake property. The properties were found and purchased with the assistance of Defendant, although he was not monetarily obligated for the purchases of the land owned by FRM.
Defendant eventually divorced his first wife, and a property settlement was reached. Plaintiff and Defendant planned to marry in August 1993 and agreed to enter into a matrimonial agreement that would delineate which of their properties would be deemed separate and which properties would be deemed community. They met with Defendant's attorney and friend, Paul Spillers, who informed Plaintiff that he was there representing and advising his client, Defendant, and that he could not be her attorney in this matter. Plaintiff allegedly told Spillers that she understood and that she had an attorney, but was unsure about using him for this matter.
The Agreement was prepared by Spillers. By letter dated July 21, 1993, a copy was mailed to his client, Defendant, along with two attached exhibits, A and B, which allegedly described all the separate property owned by each party. FRM was not listed on Plaintiff's Exhibit B. In fact, it listed only one tract of land, called the Sibley Tract, which she had inherited from her grandmother. Defendant's Exhibit A is several pages long and contained legal descriptions of 13 pieces of immovable property. Plaintiff did not receive a copy of the Agreement from Spillers since she was not his client. Defendant claims that she must have seen a copy at their office because she handled all the mail delivered there. Defendant made corrections to the legal descriptions and returned his exhibit to Spillers, who thereafter sent Defendant a *1150 final draft of the Agreement by letter dated July 26, 1993.
Plaintiff claims that she saw and read the Agreement for the first time on August 5, 1993, two days before their wedding, when she and Defendant were driving to the courthouse in Ruston, Louisiana, to execute it in front of a notary public and two witnesses.
Except for the attached exhibits, the Agreement is three pages long. The first page names the parties and states that it is to take effect upon their marriage. The second and third pages contain signatures and the following clauses, which led to this extensive lawsuit:
1.
Appearers shall be separate in property with respect to the property described on the attached Exhibits "A" and "B". The attached Exhibit "A" describes the separate property of GARY EDWARD PATTERSON. The attached Exhibit "B" describes the separate property of MELODYE TANNER BARNES. Appearers declare and acknowledge the property listed and described on the attached exhibits shall henceforth be the separate property of each. Each Appearer hereby expressly reserves to himself/herself, individually, the entire administration and control of his/her respective separate properties.
2.
Any income recognized by either Appearer with respect to their separate property shall constitute community income. For these purposes income shall be recognized at that point in time when income is recognized for federal income tax purposes.
* * *
3.
Appearers hereby adopt the legal regime of community property with respect to all other assets of whatever nature they may own, it being their specific intent that all assets other than the assets described on the attached exhibits shall be and are hereby converted to community property.
4.
Any debts, obligations, and liabilities of your Appearers that exist as of the date of marriage shall retain their character as separate obligations. Any obligations, debts, or liabilities incurred after marriage shall constitute community obligations.
Pursuant to the Agreement, a community of acquets and gains was established during the existence of the marriage. In October 2009, Plaintiff filed a suit for divorce, alleged adultery and requested that their community be terminated. The judgment of divorce was signed on May 7, 2010.
In April 2010, prior to rendition of the divorce judgment, Plaintiff filed a separate suit entitled, "Petition to Declare the Matrimonial Agreement Invalid in Part and/or to Declare the Matrimonial Agreement in Part a Donation Subject to Revocation for Ingratitude." This suit was given a different docket number from her suit for divorce. In July 2012, she amended her petition in the action to declare the Agreement invalid or a donation. Eventually, the divorce matter, in which she sought the division of the community property, and the matrimonial agreement matter were consolidated by order of the trial court.
In February and April 2016, a trial was held which concerned the division of property between Plaintiff and Defendant. The testimony given at the trial on the facts leading up to the formation of FRM is summarized briefly as hereafter follows.
Plaintiff and Defendant began a relationship while Defendant was still married *1151 to his first wife. In 1988, Plaintiff wanted to purchase a home and a tract of land (the Heard tract), but had difficulty obtaining financing. She decided to form FRM to purchase the property, then used the proceeds from the sale of timber from the property to reduce the amount due on the note associated with the purchase. She stated that at the time of the formation of the company, Defendant was very adamant that he never intended to marry her or divorce his wife. She also stated that their relationship was never constant and that it was sporadic even up until the time that they did marry in 1993.
Plaintiff formed FRM in April 1988, she has always been the registered owner of all of the stock in the corporation and all of the K-1 tax forms have all been issued to her. Article VII of FRM's articles of incorporation concerns authorized shares and states in pertinent part as follows:
The said stock of this corporation shall be fully paid and non-assessable when issued, shall be represented by certificates and shall be personal property. No transfer of the said stock shall be binding upon this corporation unless said transfer is made in accordance with this chapter [.]
Article VIII concerns transfer restrictions and states as follows:
No shareholder may transfer, voluntary or involuntary, by donation inter vivos or mortis causa, by operations of law, or through dissent or distribution any stock of this corporation without said shareholder, heir, administrator or executor, first offering it to this corporation at the same price that shareholder may have been offered for such stock by any prospective purchaser.
* * *
The right vested in this corporation to purchase the stock of any shareholder of this corporation desiring to sell any stock of this corporation may be waived, in writing, by all of the other record shareholders of this corporation at any time.
FRM bought the Heard tract for $48,838 and immediately harvested the timber. International Paper paid $45,302 for the harvested timber, and Plaintiff wrote a check on behalf of FRM to Marion State Bank for that amount with a notation that it was for the Heard tract note.
In 1988, FRM acquired the DeSoto tract for $125,000, and $117,000 of timber was harvested off of it. FRM acquired the Caney Lake property in 1990 for $32,000 or $33,000, and Plaintiff testified that she used the previously existing collateral mortgage notes to secure the loan for it.
Defendant testified that although Plaintiff acquired the Heard tract through FRM in 1988, he was the person who found the property for her and was instrumental in the sale of the timber to International Paper. He stated that he knew his first marriage was over at that point, and FRM was formed so that Plaintiff could acquire land and Defendant's first wife would not have any claim on it. He further stated that from the outset, he and Plaintiff had discussed the ownership of FRM and that there was no question that they agreed each would own half of the company after their marriage. He also testified that years into their marriage, Plaintiff requested that she be made part owner of his company, Patterson Forestry Consultants, LLC ("PFC"), since he was half owner of FRM. For that reason, he made her a 45 percent owner of PFC in exchange for his presumed ownership of half of FRM.
Fred McGaha represented Defendant in his divorce from his first wife from 1989 until early summer of 1990. He testified that he knew about the relationship between *1152 Plaintiff and Defendant and their plans to marry in 1988 or before, but Defendant had to complete his property settlement with his first wife. He stated that during the spring of 1990, Defendant told him he had found some property to purchase on Caney Lake. He told Defendant that his situation was already complicated and he hated to see him complicate it even more by buying property while his suit for separation and divorce from his first wife was pending. When he advised Defendant to wait, Defendant replied that he had taken care of the problem in that Plaintiff would purchase the property through FRM as owner. He stated that Defendant further told him that the Caney Lake property was too good of a deal to pass up; and, although he was not going to put money into the corporation, after he and Plaintiff were married, they were going to "make it all community." He again advised against acquisition of the Caney Lake property under those conditions and warned Defendant that if a lawyer found out during the litigation with the first wife that his mistress had formed a corporation, it would be a source of litigation and expense proving that it was Plaintiff's separate property. Shortly thereafter, he withdrew from representing Defendant in the litigation with his first wife.
McGaha also testified that a later conversation had occurred with the parties at the Caney Lake property. He asked Defendant if they had ever done anything to establish the property as jointly owned, and Defendant answered negatively. Then he asked Plaintiff the same question, and she answered that they would make it community property after they were married. He stated that his memory was vivid on that issue because he was worried that Defendant was putting all his time and effort into the properties that they were acquiring, but that he was not going to have an interest in them; however, after the conversation at Caney Lake, he was "comfortable" that Defendant would have an interest in the property because Plaintiff had said she was going to make it community property after their marriage. Defendant affirmed this conversation, but Plaintiff disputed the assertion that she ever said that.
There were also discrepancies in the testimony of the various witnesses concerning the creation and execution of the matrimonial agreement. Spillers testified that the parties came to his office together, knowing that the topic of the meeting was the Agreement, and that Plaintiff came prepared to discuss FRM being part of that Agreement. He stated that she brought FRM documents, including the articles of incorporation, and that she appeared to be very knowledgeable about the purpose of the meeting. He testified that neither party wanted FRM listed as his or her separate property on the exhibits. He stated that he informed Plaintiff that he represented Defendant and that she should have her own attorney. He even offered to contact the attorney who created FRM, but she declined the offer and stated she might find another attorney to consult.
Spillers further testified that the "conversion clause" found in Paragraph 3 of the Agreement was discussed during the meeting, and they also discussed Defendant's objectives while Plaintiff was present. He stated that the parties understood that if the property was not listed on the exhibit, they would be bringing property into the marriage and that it would be converted to community property.
Plaintiff's version of the meeting is contrary to that of Spillers. She claimed that she was totally unaware of the effect of the Agreement and that she did not understand that by failing to put FRM on her *1153 exhibit list as her separate property, she was agreeing to have the shares converted to community property. She claimed that FRM was not mentioned at the meeting and neither was the conversion clause. She testified that the clause was hidden in the document she signed two days before she got married and that she would never have consented to that result had she known the Agreement contained that clause. She stated that she believed Spillers had her best interest at heart, despite his testimony that he kept telling her he was not her attorney and that she needed to consult an attorney of her choosing. She had no idea FRM was a topic being covered that day, and she believed there was a stock transfer restriction in FRM's articles of incorporation which precluded the transfer to Defendant of the shares as community property. She stated that she did not believe she had the power to convey the stock to anyone without first offering it to the company in accordance with the stock transfer restriction in the articles.
Following trial, the trial court found the Agreement valid and not contrary to public policy or revocable as a result of fraud and then addressed Plaintiff's arguments of whether FRM's articles of incorporation stock transfer restriction prohibited the conversion of the stock to community property. It determined that the Agreement made any property not listed as separate property on Exhibits A and B community property. Because FRM stock was not listed on Exhibit B as Plaintiff's separate property, it was deemed community property. It noted that all 100 shares became community property; but in that transition, Defendant did not acquire title to 50 shares. Therefore, the conversion from separate to community property was not a sale so as to require compliance with the stock transfer restrictions contained in the articles of incorporation. No transfer of title to the stock was needed to categorize the shares as community property. Further, it found that the articles of incorporation permitted a waiver in writing of transfer restrictions. Because the Agreement was in writing and signed by all shareholders of record, i.e., Plaintiff, it did not find that the transfer restrictions prevented the reclassification of FRM stock from separate to community property.
The trial court also addressed other issues in its reasons for judgment including whether Paragraphs 3 and 4 of the Agreement were donations subject to revocation for ingratitude as Plaintiff had argued. It found that the Agreement contained no language of donative intent and that it was a bilateral contract in that there were reciprocal covenants, agreements and obligations for each.
The trial court further addressed the issue of whether the Agreement was unconscionable because it provided that the debts of each party remain their separate debts, while at the same time converting their separate property to community property. Its reasons for judgment discuss the various premarital debts of the parties and found that the Agreement was not unconscionable when considered in light of the Agreement as a whole and the benefits to Plaintiff.
The last issue addressed by the trial court was whether the Agreement should be invalidated on the basis of fraud or because there was no meeting of the minds and, thus, no consent. Despite Plaintiff's testimony that the Agreement's effect on the FRM shares of stock was not brought to her attention and that she had thought that Spillers was acting in her best interest, it found there was no fraud involved in the confection of the Agreement and that there was consent and a meeting of the minds regarding the Agreement and the conversion clause.
*1154 For the above reasons, the trial court found the Agreement valid and, further, that the shares of FRM, which were formerly Plaintiff's separate property, were converted to community property. Plaintiff appeals this judgment.
DISCUSSION
Plaintiff first raises the issue that the trial court erred in finding the Agreement valid and argues that it committed factual and legal errors in its reasoning. She contends that when one or more trial court errors interdict the fact-finding process, the manifest error or abuse of discretion standard is no longer applicable and that, if the record is otherwise complete, this court should make its own independent de novo review of the record.
Plaintiff claims that even though the document executed on August 5, 1993, is entitled "Matrimonial Agreement," it was not a matrimonial agreement and should not be enforced between the parties. She maintains that only one provision of the Agreement would truly be unenforceable since the rest of the document only submitted the parties to the general provisions regarding the community of acquets and gains as they would have been subjected to by operation of law. She points out that if they had not signed the Agreement, all of the general rules regarding community property would have taken effect upon their marriage. Therefore, calling the document "Matrimonial Agreement" is an intentional misclassification of the document because it neither established a regime of separate property, nor modified the legal regime of the community of acquets and gains that would exist between the parties.
Plaintiff also argues that the true purpose of the Agreement seemed to be an attempt by Defendant, through the use of the conversion clause, to transfer a one-half interest in certain items of property owned by them prior to marriage. She contends that this purpose was not disclosed or adequately described to her in the Agreement.
Plaintiff further argues that, with respect to items not listed on the exhibits attached to the Agreement, it had been repeatedly stated that the conversion clause did not change the nature of the ownership of the property, but simply converted it from separate to community. She claims that there is an inherent problem with that statement since the definition of community property in the Louisiana Civil Code is defined as "each spouse owning a present undivided one-half interest" in the community property. Plaintiff contends that the Louisiana Civil Code does not contemplate solely owned assets forming a part of the community and takes great care, in La. C.C. art. 2341.1, in setting forth the distinctions between separate and community interests in the same assets owned in undivided ownership. She argues that because the marital status of the parties was such that there was no community property regime in effect at the time of the execution of the Agreement, the transfer of assets from one spouse to another to be held as community property was impossible at the time of execution.
Plaintiff also argues that there are several problems with the method used by Defendant to achieve the conversion and claims there would have been other options for the transfer, such as through use of La. C.C. art. 2343.1, entitled "Transfer of separate property to the community." She contends that had this article been invoked, there would have been no doubt as to the consent and intent of the parties, and the assets would have had to be specifically set forth in the document.
*1155 Plaintiff claims that her misunderstanding of the Agreement and lack of consent are evident and that Defendant's deceitful pattern of behavior, supported by the testimony of attorneys/friends who were attempting to protect their own reputations, should not be used to bolster the effect of the conversion clause. For these reasons, she asserts that the trial court erred in ruling that the Agreement is valid.
Plaintiff further argues that the trial court relied on the actions undertaken by Defendant during the marriage and the conversion clause in the Agreement when it decided that the shares of FRM should be considered community property. She claims that the court detailed numerous actions by Defendant on behalf of FRM (such as signing documents, negotiating contracts, working on projects, contacting entities and individuals and representing FRM in her absence and on the company's behalf) as constituting evidence of ownership of shares of stock, but she contends that none of those actions prove, or even suggest, ownership.
Plaintiff also argues that it did not matter whether the shares of FRM were considered her separate property or community property because Defendant received the benefits of income from the separate property under community property law, and he also stood to receive the benefit of the income to his own company for services provided to FRM throughout their marriage. She points out that she made a clear statement each year that she was under the impression that FRM was her separate property, and she showed this by listing herself as the sole owner of FRM on the couple's annual tax returns. Although the income from the company was deemed community property, she contends that the open declarations she made each year on the tax returns regarding her sole ownership of the company, which were confirmed by Defendant, should not be disregarded.
Plaintiff also claims that the trial court misinterpreted her signing the Agreement as acquiescence in the transfer of ownership of the stock. She maintains that she had no intention of transferring her stock and notes that there was no specific mention in the Agreement regarding FRM stock. She also disputes Spiller's testimony in that she never discussed FRM in the meeting with him and did not recall taking any documents, i.e., articles of incorporation, bylaws or reports filed with the Secretary of State to the meeting. She argues that Spillers never had any conversation with her regarding the effect the Agreement would have on the articles of incorporation and the stock restriction prohibiting transfer. For these reasons, she asserts that the trial court's reliance on the actions taken by Defendant during the marriage and the reliance on the testimony of Defendant and his attorney led to legal error.
In opposition to Plaintiff's assignments of error, Defendant claims the trial court did not commit manifest error and that the Agreement is valid. Further, he contends that the trial court was correct in finding that FRM is community property.
Defendant first argues that the proper standard of review in this case is the manifest error-clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, and the reviewing court must give great weight to the factual conclusions of the trier of fact. Defendant contends that the trial court's factual findings were within its discretion and that no error was committed since it found the Agreement to be a valid *1156 onerous contract between the parties. He notes that Plaintiff failed to cite any actual legal error committed by the trial court, but, instead, argued only that the Agreement set forth existing community property law, that it could not establish the nature of future community assets, that there are alternative procedures for achieving the end result and that the trial court made incorrect factual determinations. Because the Louisiana Civil Code limits marital agreements only if they are against public policy and if they alter the marital portion or affect third persons' rights, he claims Plaintiff's assertions are without merit. He maintains that the trial court simply interpreted the Agreement as an onerous contract and committed no error in finding so.
Defendant also argues that his testimony, and that of Spillers and McGaha, led the trial court to the conclusion that the Agreement and the conversion clause actually accomplished what the parties intended to do at the time. He claims that the trial court's decision was based on the credibility it gave each witness, and there was no objective evidence to rebut its findings of fact; and, therefore, Plaintiff's first assignment of error must fail.
In opposition to Plaintiff's assignment of error that the stock restrictions in the articles of incorporation of FRM prevent the shares of stock from "being transferred" and becoming community owned, Defendant argues that Plaintiff incorrectly equated holding stock title, or managing stock, with ownership of the stock. He claims that the FRM stock became community property when the parties married, pursuant to the Agreement. The stock itself was never "transferred," and only the nature of the ownership interest changed. Upon marriage, he acquired a community interest in the stock, but did not acquire any of the management powers of a shareholder, and he could not exercise any privileges associated with the stock as would be exercised by a shareholder. He asserts that although Plaintiff argues that the actions undertaken by him on behalf of FRM do not prove or suggest ownership, he finds any evidence of the fact irrelevant, since it is the Agreement, not his actions, that converted the shares of stock from separate into community property. Likewise, he asserts that it did not matter that Plaintiff claims 100 percent ownership of the stock on the tax return. He did not dispute that she was the registered owner of the stock for tax purposes, and the fact that the tax return reflects that she is the sole owner does not negate the efficacy of the Agreement in the conversion of the stock from separate to community. Further, the issuance of a K-1 in Plaintiff's name does not alter the status of Defendant's community interest in the stock.
Last, Defendant argues that Plaintiff's actions in executing the Agreement in her individual capacity and not including FRM on her separate property exhibit list resulted in a waiver of the stock transfer restriction found in FRM's articles of incorporation.
The Matrimonial Agreement
The threshold issue to be discussed in this case is whether the trial court erred in finding the Agreement valid and enforceable.
In cases where classification of property as either community or separate property is the issue, courts hold that this determination is factual and subject to the manifest error standard of review. Ross v. Ross , 02-2984 (La. 10/21/03), 857 So.2d 384 ; Boone v. Boone , 39,544 (La. App. 2 Cir. 4/6/05), 899 So.2d 823. Under this standard, a factual finding cannot be set aside unless the appellate court finds that the trial court's determination is manifestly erroneous or plainly wrong.
*1157 Kyle v. Smith , 43,781 (La. App. 2 Cir. 12/3/08), 999 So.2d 130. In the instant case, the judgment was plainly based on factual findings to which we will apply the manifest error rule.
La. C.C. art. 2328 provides that a matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal regime. In the matrimonial agreement, spouses are free to establish a regime of separation of property or modify the legal regime as provided by law. Id. The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect. Id. La. C.C. art. 2329 states that spouses may enter into a matrimonial agreement before or during the marriage as to all matters that are not prohibited by public policy. The matrimonial agreement shall be made by authentic act or by an act under private signature duly acknowledged by the spouses.
The factual findings of a fact finder will not be disturbed absent manifest error. New S. Commc'ns v. Wright , 35,442 (La. App. 2 Cir. 12/28/01), 803 So.2d 1103, citing Powell v. Reg'l Transit Auth. , 96-0715 (La. 6/18/97), 695 So.2d 1326, and Rosell v. ESCO , 549 So.2d 840 (La. 1989). When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, the appellate court on review should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact. Powell , supra , citing Canter v. Koehring Co. , 283 So.2d 716 (La. 1973). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. New S. Commc'ns v. Wright , supra , citing Rosell v. ESCO , supra ; Morris v. United Servs. Auto. Ass'n , 32,528 (La. App. 2 Cir. 2/18/00), 756 So.2d 549.
The Agreement at issue in this case specifically stated on its first page that it was to take effect only upon the marriage of the parties. Therefore, the arguments concerning the fact that there was no community between the parties at the time the Agreement was signed are without merit.
Paragraph 1 of the portion of the Agreement concerning the regime under which the parties would operate after marriage stated that the parties would be separate in property with respect to the properties listed on attached Exhibits A and B. Paragraph 3 stated that the parties adopted the legal regime of community property with respect to all other assets of whatever nature they may own, it being their specific intent that all other assets than those described on the exhibits "shall be and are hereby converted to community property."
The Agreement clearly states the intention of the parties to be separate only in regard to that property listed on its attached exhibits. Plaintiff's exhibit was silent in regard to FRM. The Agreement also stated that if the property was not found on the exhibit lists, it would be converted to community property. The Agreement is very short; the conversion clause is not hidden in any way.
Plaintiff signed this agreement even though she had not consulted an attorney before doing so. She was formerly employed in the banking industry, had formed her own corporation and had been able to finance the purchase of three properties through FRM. Defendant's attorney testified that he considered her a knowledgeable person when she appeared before him at his office with Defendant to discuss the Agreement and other matters. The trial court heard Plaintiff's testimony and found her to be a person who could understand the ramifications of signing the document.
*1158 It also heard the testimony of all the parties and witnesses and found the testimony of Defendant, Spillers and McGaha more credible than that of Plaintiff.
Based on the evidence presented, the trial court concluded that the Agreement is valid and enforceable. We find that trial court did not commit error and that Plaintiff's arguments in regard to this issue are without merit.
The FRM stock conversion from separate to community property
La. C.C. art. 2343.1 states that the transfer by a spouse to the other spouse of a thing forming part of his separate property, with the stipulation that it shall be part of the community, transforms the thing into community property. As to both movables and immovables, a transfer by onerous title must be made in writing and a transfer by gratuitous title must be made by authentic act. Id. The revision comment to this article, dated 1981, reflects that a spouse may convey to the other spouse a thing that forms part of the transferor's separate property, with the stipulation that the thing shall be part of the community. The thing may be solely owned by the transferor, or one that he owns as an undivided interest. In effect, the transferor conveys to the other spouse one-half of what he owns and retains the other half as co-owner under the regime of acquets and gains.
The case of Schexnayder v. Yolande Schexnayder & Son, Inc. , 12-885 (La. App. 5 Cir. 5/23/13), 119 So.3d 624, concerns a husband's transfer of separate property to a community via donation rather than a prenuptial agreement and discusses the effect the transfer had on the property, which happened to be 7,500 shares of stock in a privately owned company issued in the husband's name. The wife tried to claim that the donation was made to her separate property and that she was entitled to vote the shares of stock. The Fifth Circuit stated that, generally, either spouse acting alone may manage, control or dispose of community property unless otherwise provided by law, citing La. C.C. art. 2346. Under La. C.C. art. 2351, each spouse has the exclusive right to manage, alienate or encumber movables issued or registered in his name. Shares of stock are incorporeal movables, and shares of stock issued in the name of a spouse are subject to management by that spouse exclusively. Schexnayder , supra , citing La. C.C. art. 473 ; Champagne v. Champagne , 07-1078 (La. App. 1 Cir. 6/27/08), 992 So.2d 1072 ; and Rao v. Rao , 05-0059 (La. App. 1 Cir. 11/4/05), 927 So.2d 356, writ denied , 05-2453 (La. 3/24/06), 925 So.2d 1232. Despite acknowledging these general provisions, the fifth circuit cited La. C.C. art. 2343.1 and determined that the husband had made the donation to the community, not to the wife individually; and since he was the registered shareholder, he retained the right to vote the 7,500 shares of stock in his name.
In the case at bar, Plaintiff argued that Article VIII of the FRM articles of incorporation prohibited her from transferring the shares through the Agreement without first offering them to FRM. The language of the transfer restriction clause is couched in terms of transfer, donation and sale, and, for the sake of ease, is repeated here:
No shareholder may transfer, voluntary or involuntary, by donation inter vivos or mortis causa, by operations of law, or through dissent or distribution any stock of this corporation without said shareholder, heir, administrator or executor, first offering it to this corporation at the same price that shareholder may have been offered for such stock by any prospective purchaser.
* * *
The right vested in this corporation to purchase the stock of any shareholder of *1159 this corporation desiring to sell any stock of this corporation may be waived, in writing, by all of the other record shareholders of this corporation at any time.
Plaintiff signed a document transferring her separate property and converting it to community property. By signing, she, as the sole shareholder of FRM, waived, in writing, the right for the corporation to purchase the stock. Therefore, Article VIII of the FRM articles of incorporation cannot operate to prevent Plaintiff from allowing her shares to be converted to community property.
As the trial court pointed out, it is only the nature of the ownership of the shares, in community, that has changed. Plaintiff still retains all voting rights since the shares were issued in her name. Her arguments concerning the conversion of FRM stock from separate property to community are without merit.
CONCLUSION
For the foregoing reasons, we find that the Matrimonial Agreement is a valid and enforceable agreement entered into by the parties prior to marriage, which took effect upon their marriage. In accordance with the plain language of the agreement, Financial Resources Management of Louisiana, Inc., which was not listed on Plaintiff's exhibit as separate property, was converted to community property. The judgment of the trial court in favor of Defendant Gary Edward Patterson and against Plaintiff Melodye Patterson, nee Tanner, is hereby affirmed. Costs of appeal are assessed against Melodye Patterson, nee Tanner.
AFFIRMED.