Judgment rendered May 18, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,015-CA
No. 54,016-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

No. 54,015-CA

STATE OF LOUISIANA,
MILITARY DEPARTMENT
AND DEPARTMENT OF
PUBLIC SAFETY, OFFICE
OF STATE POLICE
    Plaintiffs-Appellees

versus

EXPLO SYSTEMS, INC.,
CRUM AND FORSTER
SPECIALTY INSURANCE
COMPANY AND SENECA
SPECIALTY INSURANCE
COMPANY
    Defendants-Appellants

No. 54,016-CA

EMPLOYERS
MUTUAL
CASUALTY
COMPANY A/S/O
THE VILLAGE OF
DIXIE INN, LOUISIANA
    Plaintiffs-Appellees

versus

EXPLO SYSTEMS,
INC., AND CRUM &
FORSTER SPECIALTY
INSURANCE
COMPANY
    Defendants-Appellants

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court Nos. 73438 and 73443

Honorable Allen Parker Self, Jr., Judge

* * * * *

WEEMS, SCHIMPF, HAINES,
SHEMWELL, & MOORE, APLC

Counsel for Appellants,
Crum & Forster

By: Carey T. Schimpf             Specialty Insurance
     Kenneth P. Haines        Company and Seneca
                                         Specialty Insurance
                                         Company

THOMPSON, COE, COUSINS & IRONS, LLP      Counsel for Appellants,
By: Christina Anne Culver                        Crum & Forster
     Brian S. Martin                          Specialty Insurance
     Kevin Risley                              Company and Seneca
                                         Specialty Insurance
                                         Company

PATRICK R. JACKSON, APLC              Counsel for 1st Appellees,
By: Patrick R. Jackson                       State of Louisiana,
                                         Military Department and
                                         Department of Public
                                         Safety, and Office of State
                                         Police

PETTIETTE, ARMAND, DUNKELMAN,       Counsel for 2nd Appellees,
WOODLEY, BYRD & CROMWELL, L.L.P.     Employers Mutual
By:   E. Henry Byrd, IV                   Casualty Company A/S/O
     Joshua Phillip Monteleone           The Village of Dixie Inn
     Joseph Samuel Woodley

\* \* \* \* \*

Before MOORE, PITMAN, STONE, HUNTER, and
O'CALLAGHAN *(Ad Hoc)*, JJ.

O'CALLAGHAN, J. (*Ad Hoc*), concurs in part and dissents in part for the
reasons assigned.

MOORE, C.J., concurs in part and dissents in part for the reasons assigned by
O'Callaghan, J. (*Ad Hoc*).

**STONE, J.**

The instant litigation arises out of an explosion at Camp Minden, which the Louisiana Military Department ("LMD") leased in part to Explo Systems ("Explo"). The latter was insured by Crum & Forster Specialty Ins. Co. ("Crum & Forster") and Seneca Specialty Ins. Co. ("Seneca"), effective at the time of the explosion and ensuing investigation and emergency response. Currently before this court is the appeal of defendant-insurers Crum & Forster and Seneca (collectively, "the insurers") from the grant of a partial motion for summary judgment in favor of the plaintiffs, the Louisiana State Police ("LSP") and the LMD, in the 26th Judicial District Court, Honorable Parker Self presiding. Specifically, the trial court judgment declared the policy exclusion on which the insurers relied in denying coverage unenforceable. For the following reasons, we reverse.

## FACTS

Prior to the issuance of the insurers' policies in question, insurance representatives conducted a site visit at Camp Minden. A report based on that site visit was generated and provided to the underwriters who, obviously, approved issuance of the respective policies.

Explo was in the business of, among other things, "demilitarizing" the military's excess munitions (explosives). The United States Army's Joint Munitions Command ("JMC") held a public bid auction soliciting private enterprises to bid on a contract to demilitarize munitions containing M6 propellant charges. In competing for the contract, Explo represented to the JMC that it had unused capacity to (properly) store 70 million pounds of explosives; however, it was revealed – after the Camp Minden explosion –

that capacity did not exist. In March of 2010, the JMC awarded that contract to Explo. In exchange for demilitarizing the explosives, the United States Government paid Explo millions of dollars. In connection with this arrangement, the JMC required Explo to contractually agree to abide by all applicable laws and regulations and to submit documentation of its dispositions of the explosives, including the quantity disposed and the identity of the recipient of the explosives (if any).[1] The purpose of this documentation was to enable the JMC to track the movement of the explosives and Explo's inventory levels. Explo quickly reached maximum lawful storage capacity for the demilitarized M6 propellant, but never informed the JMC. Instead, Explo submitted fraudulent disposition receipts to hide the storage capacity problem from the JMC.

Explo's demilitarization operation was subject to strict regulation and monitoring. This involved several agencies, including the Defense Contract Management Agency, the LMD, the Louisiana Department of Environmental Quality, and the federal Environmental Protection Agency. The regulations included a maximum limit on the total net amount of explosives Explo was allowed to have in its respective permitted explosives storage magazines at Camp Minden. The regulations also specified the type and location of structures Explo was to use to store the explosives (hereinafter referred to as "storage magazines") and the minimum distances between storage magazines. The Louisiana National Guard made periodic inspections at Camp Minden meant, in part, to assess Explo's compliance

_____

[1] These documents are referred to as "End User Certificates," often abbreviated as EUCs.

2

with the applicable laws and regulations, including inventory limits and compliance with storage protocol.

Explo violated the law and its contract with the JMC by receiving and holding more M6 propellant at Camp Minden at one time than it could properly store.[2] The JMC paid Explo based on the amount of M6 propellant Explo *demilitarized* (*i.e.,* not based on how much was fully disposed). Explo could demilitarize more explosives than it could properly store or dispose. Thus, inventory limits—had they been obeyed—would have restricted Explo's monetary earnings. As previously mentioned, once the facility reached its maximum lawful capacity, Explo submitted to the JMC disposition receipts (called "EUCs") which, in the aggregate, overstated the amount of Explo's outgoing deliveries of demilitarized M6 propellant by several million pounds. This deception induced the JMC to continue delivering the explosives despite the excess over the lawful storage capacity. It also enabled Explo to avoid regulatory enforcement. Additionally, Explo knew when the inspectors were coming and would hide the excess explosives off-site in the woods nearby until completion of the inspection. Also, the doors of the permitted storage magazines were required to bear placards indicating the contents of the building. Explo would flip the placards so the blank rear side was showing to create the impression that there was nothing inside when, in fact, the magazines were at or beyond maximum capacity. Explo also obstructed the inspections by piling up objects so as to block the inspector's access to certain areas in a seemingly innocuous manner.

---

[2] Several Explo officials pled guilty to conspiracy to defraud the United States and to making false statements to federal officers in relation to the demilitarization contract and operation.

As alluded to above, Explo actually sent some demilitarized M6 propellant to various third parties, including Boren Mining Co. In February of 2012, approximately eight months prior to the Camp Minden explosion, Boren returned multiple truckloads of M6 propellant, which Explo left stored in the 18-wheeler trailers in which they arrived up to (and beyond) the October 15, 2012 explosion.

The October 15, 2012 explosion was actually two separate explosions, one being the contents of magazine 2464 (*i.e.*, over 124,000 pounds of smokeless powder) and the other being the contents of the nearby 18-wheeler trailer. It is unclear which detonated first, but surveillance video showed that the latter explosion was bigger than the first. Also, it *is* clear that the first detonation caused the second detonation because of its proximity.

There is a contradiction in the summary judgment evidence regarding whether the 18-wheeler trailer that exploded contained smokeless powder or M6 propellant. On one hand, a report generated by the LSP investigator who responded to the explosion on the following day indicated: (1) the trailer contained smokeless powder, and it spontaneously detonated first due to "decomposition"; and (2) the initial detonation caused the smokeless powder in magazine 2464 to also detonate.

On the other hand, testimony of Brett Spiers, a federal agent who was involved in the investigation, indicated that it was actually M6 propellant (returned from Boren Mining Co. in February 2012) in the 18-wheeler trailer that detonated. He admitted he is not an explosives expert, but still believes that magazine 2464 exploded first and the 18-wheeler trailer exploded because it was too close to the magazine. Spiers also testified that the

smokeless powder in magazine 2464 was stored properly. Lionel Koons, the Explo official in charge of storage and movement of explosives at Explo's Camp Minden site, testified at his federal sentencing hearing that he knew the M6 propellant that exploded in the trailer was stored improperly.

The ensuing investigation also discovered that Explo had a total of 18 million pounds of explosives at Camp Minden after the explosion, including over 15.6 million pounds of demilitarized M6 propellant. Explo stored the excess explosives (*i.e.*, above lawful storage capacity) in improper containers, such as cardboard boxes and bags lying on the ground outdoors, and left explosives sitting in 18-wheeler trailers for several months at a time. It also loaded the excess into buildings not licensed for storing explosives. Nearby residential areas were evacuated upon this discovery, and the governor declared a state of emergency. The LSP sent a team to Camp Minden to secure the improperly stored explosives, move them from unsafe storage to safe storage, and, ultimately dispose of them. This process took years.

Several Explo officials (managers, executives, owners, and employees) pled guilty to crimes in connection with Explo's operations and with its fraudulent inducement of the JMC to grant the demilitarization contract and to continue delivering explosives after Explo inventory had reached maximum proper storage capacity. Three Explo officials, including inventory and traffic control manager Lionel Koons,[3] pled guilty to "Careless …[storage]… of explosives" in violation of La. R.S. 40:1472.18, which, in relevant part, states:

---

[3] Lionel Koons directed the storage and movement of the explosives at Explo's Camp Minden site.

5

> No person shall store…explosives …as defined by R.S. 40:1472.2, in a careless or imprudent manner without regard for the hazards or circumstances in which the explosives…are being stored

In turn, La. R.S.40:1472.2, in relevant part, provides:

> "Explosives" means any chemical compound, mixture, or device, the primary or common purpose of which is to function by explosion. The term includes but is not limited to dynamite and other high explosives and black powder in quantities in excess of five pounds

Several Explo officials pled guilty to federal crimes as well, including: (1) conspiracy to defraud the United States, the object of which was to receive money from the government to which Explo was not entitled; and (2) the making of false statements to the government regarding Explo's operations and storage capacity. The federal guilty pleas included stipulations to detailed factual predicates.

## PROCEDURAL HISTORY

The LMD and the LSP filed suit against Explo and its insurers. The LSP seeks to recover the costs of their investigation triggered by the explosion and for the response to the emergency created by Explo's vast improper storage of the explosives that did *not* accidentally detonate. The LMD seeks damages stemming from the explosion on its property, as well as for the pollution caused by the explosion and by the illegal possession and storage of explosives that did not detonate.

Relying on exclusions in their respective policies for damage caused by the insured's criminal, fraudulent, or dishonest conduct, the insurers denied coverage of the plaintiffs' claims. In response, the plaintiffs added claims for bad faith against the insurers pursuant to La. R.S. 22:1973.

At this point, we explain the circumstances underpinning the trial court's issuance of a discovery sanction against the insurers. In the course of this litigation, the plaintiffs allegedly made discovery requests which required the defendants to disclose the pre-issuance site visit report; however, the record does not contain an order compelling discovery prior to the imposition of the discovery sanction.

The first discovery-related motion contained in the record is a motion to establish spoliation and sanctions, which was filed on behalf of the plaintiffs on September 29, 2017. Shortly thereafter, the defendants tendered the site visit report, thus mooting the motion for spoliation and sanctions. Nonetheless, in January 2018, the trial court issued the discovery sanction declaring that the jury would be instructed that the "defendants had constructive knowledge of the operations of Explo based upon a site visit, which occurred six months before the policy of insurance was issued by defendants to Explo." The trial court made that finding of constructive knowledge *sua sponte*, purportedly using the procedural vehicle of a discovery sanction under La. C.C.P. art. 1471.

The parties filed cross motions for summary judgment. In ruling thereon, the trial court deemed it conclusively established that the defendant insurers had constructive knowledge of Explo's criminal, fraudulent, and/or dishonest conduct in conducting its operations prior to issuing the policies. The trial court granted summary judgment in favor of the plaintiffs on the issue of enforceability of the exclusions, reasoning that the exclusions were unenforceable because the insurers constructively knew about the criminal, fraudulent, or dishonest conduct months before the issuance of the policies. The trial court denied the insurers' MSJ *sub silentio* and excluded the

7

affidavit of the insurers' proffered expert regarding the claims handling process as it relates to the bad faith claim.

The insurers appealed, in substance asserting three assignments of error: (1) the trial court erred in holding that the insurers' prior knowledge of the insured's criminal conduct rendered the criminal, fraudulent, or dishonest conduct exclusions unenforceable; (2) the trial court erred in using a *sua sponte* discovery sanction to make the determination, for purposes of summary judgment, that the insurers knew of the insured's criminal conduct; and (3) the trial court erred in excluding the affidavit of the claims handling expert that the insurers proffered regarding the bad faith claim.

**Relevant provisions – Crum & Forster policy**

Crum & Forster issued policy number EPK – 100814 to Explo for the period from September 12, 2012, through September 12, 2013. It contained three coverage parts: (1) Commercial General Liability Occurrence Coverage; (2) Third Party Pollution Liability Coverage; and (3) Onsite Cleanup Pollution Liability Coverage. Additionally, a Designated Operations Coverage Endorsement attached to the policy provided that coverages under all three parts of the policy apply only to "bodily injury" or "property damage" arising out of: (1) thermal treatment and disassembly of ammunition; and (2) recycling and separation of remaining scrap. The policy also excluded coverage for any claim based upon or "arising out of any criminal, fraudulent, or dishonest act, omission or offense committed by [Explo]."

**Relevant provisions – Seneca policy**

Seneca issued Commercial Property Policy Number SSP 22 011 76 to Explo for the period from January 22, 2012, through January 22, 2013.

8

The Building and Personal Property Coverage Form in the Seneca policy provided that the insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." "Covered property," under the policy, included buildings, business personal property *of the insured*, and personal property of others in the care, custody, or control of the insured for which a limit of insurance is shown in the Declaration section.

The policy also contained an exclusion barring coverage for any loss or damage caused by or resulting from "[d]ishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose: (1) Acting alone or in collusion with others; or (2) Whether or not occurring during the hours of employment."

## DISCUSSION

**Sua sponte discovery sanction**

The defendants assert that the trial court erred in imposing a discovery sanction that the jury would be instructed that the insurers had knowledge of Explo's operations prior to issuing the policies and in deeming that fact conclusively established for purposes of summary judgment.

The trial court cited La. C.C.P. art. 1471 as authorizing it to impose the foregoing sanctions. In relevant part, that article states:

> A. **If a party** or an officer, director, or managing agent of a party or a person designated under Article 1442 or 1448 to testify on behalf of a party **fails to obey an order to provide or permit discovery**, including an order made under Article 1464 or 1469, **the court in which the action is pending may make such orders in regard to the failure as are just.** (Emphasis added).

9

The record does not contain any "order to provide or permit discovery" prior to the issuance of the discovery sanction. Likewise, it does not contain any discovery request or motion to compel discovery prior to issuance of the sanction.  Based on the record, the trial court's imposition of the discovery sanction is wholly invalid under La. C.C.P. art. 1471(A) because of the absence of any disobedience of an order compelling discovery on the part of the insurers. In light of the clear and explicit language of La. C.C.P. art. 1471, the trial court was completely without authority to issue the discovery sanction.

For this reason alone, the trial court's granting of the plaintiffs' MSJ must be reversed. This erroneous and abusive discovery sanction, whereby the trial court deemed the insurers to know of illegal conduct on the part of the insured, was the basis for the trial court's ruling that the insurers "waived" enforcement of the illegal conduct exclusions.

**Waiver of exclusion**

The insurers further argue that even if it is assumed *arguendo* that the discovery sanction was proper, the doctrine of waiver (*i.e.*, the intentional relinquishment of a known right), nevertheless, would be inapplicable to the illegal conduct exclusion. More specifically, they in effect argue that their issuance of the policies with knowledge of excluded conduct legally could not have constituted a "manifestation of an actual intention to relinquish the right [to enforce the exclusion]," or "conduct so inconsistent with the intent to enforce the [exclusion] as to induce a reasonable belief that it has been relinquished."[4] For the reasons already discussed, we decline to decide

_____

[4] Quotations from *Steptore v. Masco Const. Co.,* 93-2064 (La. 8/18/94), 643 So. 2d 1213.

whether the trial court, in rejecting that argument, was correct. This issue is pretermitted.

**Exclusion of affidavit of purported expert**

We also pretermit the issue of whether the trial court erred in excluding the affidavit of the insurers' expert on the claims handling process.

## CONCLUSION

Based on the foregoing, the trial court's summary judgment in favor of the plaintiffs is **REVERSED**. The total cost of this appeal is $59,329.80. One-half or $29,619.90 is taxed to the Louisiana State Police and the remaining one-half or $29,619.90 is taxed to the Louisiana Military Department.

**O'CALLAGHAN, J. (*Ad Hoc*)**, concurs in part and dissents in part.

I respectfully concur in the portion of the majority's opinion that reverses the summary judgment in favor of the plaintiffs, the Military Department and the Office of State Police. The trial court's ruling on the motion for sanctions, when placed in the proper perspective, simply does not constitute positive summary judgment evidence that would show that the defendants, Crum & Forster and Seneca, waived their illegal acts exclusions, beyond a genuine issue of material fact. The trial court erred in granting summary judgment.

I respectfully dissent from that portion of the majority opinion finding that the original discovery sanction was improper. The sanction was imposed for the defendants' failure to turn the site report over to the plaintiffs in a timely fashion. The majority opinion reasons that a breach of court-ordered discovery is necessary before sanctions can be imposed. The majority opinion incorrectly states that there was no discovery request prior to the filing of the motion for sanctions and that there is no discovery request in the record. The discovery requests were included as attachments to the motion for sanctions. While there was no discovery order by the trial court, that court acted within its discretion in imposing the original sanction for the untimely production of the site report. In *Cambrie Celeste LLC v. Starboard Mgmt., LLC*, 2016-1318 (La. App. 4 Cir. 11/6/17), 231 So. 3d 79, *writ denied,* 17-2041 (La. 2/2/18), 235 So. 3d 1110, the fourth circuit reasoned:

> La. C.C.P. art. 1471 sanctions are triggered when a party refuses or fails to comply with a discovery order. *Even in the absence of such an order*, La. C.C.P. art. 191 "authorizes trial courts to impose sanctions for [failing to adhere to discovery rules] since [such failure] clearly interferes with the court's ability to fairly administer justice." *Carter v. Hi Nabor Super Mkt., LLC*, 13-0529, p. 7-8 (La. App. 1 Cir. 12/30/14), 168 So.

1

3d 698, 704. Thus, "[a] trial court has the authority to impose sanctions on a party for [. . .] discovery misconduct under both its inherent power to manage its own affairs and the discovery articles provided in the Louisiana Code of Civil Procedure." *Id.*, 13-0529, p. 7, 168 So. 3d at 703. [Emphasis supplied.]

I therefore believe that the original sanction was authorized. However, in my assessment, the trial court later incorrectly expanded the sanction into a finding of fact that the defendants had knowledge of the illegal and improper storage of explosives at the Explo site. This was factually inaccurate and was not appropriate in the context of a motion for summary judgment. The trial court erred in using the improper and inaccurate finding of fact as the basis for granting partial summary judgment in favor of the plaintiffs.

The result of reversing the summary judgment is that the matter goes back to the district court for further proceedings. For this reason, I must also respectfully dissent from the majority's decision to pretermit the issue of the expert witness, Robert I. Siegel. On further proceedings, such as a trial on the merits, the parties should not have to relitigate this issue. I would address this.

The defendants designated Siegel to opine on (1) the reasonableness of their claims handling and their positions with respect to the damages sought in the lawsuits, (2) the reasonableness of the plaintiffs' respective coverage positions under the policies at issue, and (3) the opinions set forth in the written report he provided. The defendants argued that, based on two decades of practical experience prosecuting and defending bad faith claims, Siegel had "specialized knowledge" of the reasonableness of an insurer's claim-handling conduct which would help the jurors understand the evidence pertaining to their handling of the instant claims. In their motion to exclude

2

his testimony, the plaintiffs argued that Siegel's opinions were inadmissible legal opinions on ultimate issues of insurance coverage and handling of insurance claims, and he was not qualified to give expert testimony on claims handling.

In its opinion/order of October 2, 2019, the court characterized the defendants' assertion that Siegel would not offer any legal opinions based on coverage as "somewhat dubious." The court found that the second page of Siegel's report expressed, in essence, legal opinions. As to the *Daubert* standards, the court voiced reservations as to Siegel's qualifications and methodology.[5] His qualifications were "specifically limited to the legal expertise of insurance claims, not the handling or adjusting of claims that would be appropriate for an experienced claims adjuster." Also, no specified methodology was offered. The court concluded that, despite his insurance litigation experience, Siegel was not qualified as an attorney to offer the proposed opinions.

The trial court is afforded great discretion regarding the decision to allow expert testimony, and that decision will not be overturned on appeal absent an abuse of that discretion. *Blair v. Coney*, 19-00795 (La. 4/3/20), __ So. 3d __, *reh. denied* (7/9/20), 298 So. 3d 168; *Miller v. Rayville Mfg.*, 53,573 (La. App. 2 Cir. 11/18/20), 307 So. 3d 1138; *Parish of Jefferson v. Housing Auth. of Jefferson Par.*, 17-272 (La. App. 5 Cir. 12/13/17), 234 So. 3d 207. Where an attorney is proffered to the trial court as an expert in a particular area of law, various Louisiana Courts of Appeal have embraced the rule that experts may not provide opinions regarding domestic (i.e.,

---

[5] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

3

Louisiana) law.  *Boone v. Boone*, 39,544 (La. App. 2 Cir. 4/6/05), 899 So. 2d 823; *Parish of Jefferson v. Housing Auth. of Jefferson Par.*, *supra*; *Normand v. Cox Commc'ns La.*, 14-563 (La. App. 5 Cir. 12/23/14), 167 So. 3d 156, *writ denied*, 15-0158 (La. 4/10/15), 163 So. 3d 815; *Crockerham v. La. Med. Mut. Ins. Co.*, 17-1590 (La. App. 1 Cir. 6/21/18), 255 So. 3d 604.  The rationale for this rule is that the judge, being trained in the law, is the ultimate arbiter of what the law is; to consider other legal opinions as to an interpretation of the law would be, if not in actuality, at least in perception, an abrogation of the judge's responsibility.  *Parish of Jefferson v. Housing Auth. of Jefferson*, *supra*.

Based on my review of this extensive record, I would find no abuse of the trial court's discretion in excluding Siegel as an expert witness, and affirm that portion of the judgment.  I therefore concur in part and dissent in part.