Judgment rendered February 26, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,027-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MELODYE PATTERSON NEE
TANNER

Plaintiff-Appellant

versus

GARY EDWARD PATTERSON

Defendant-Appellee

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 53,946

Honorable Jeffrey Levance Robinson, Judge

* * * * *

BREITHAUPT, DUBOS, &
WOLLESON, LLC
By: R. Alan Breithaupt
    James R. Close

Counsel for Appellant

HUDSON POTTS & BERNSTEIN, LLP
By: Robert McCuller Baldwin
    Jan Peter Christiansen, III

Counsel for Appellee

* * * * *

Before PITMAN, COX, and MARCOTTE, JJ.

**MARCOTTE, J.**

This appeal arises from the Third Judicial District Court, Parish of Lincoln, the Honorable Jeffrey L. Robinson presiding. Appellant, Melodye Patterson ("Melodye"), appeals the trial court's judgment of partition dividing the vast estate she once had with her former husband, Gary E. Patterson ("Gary"). For the following reasons, the trial court's judgment is affirmed.

## FACTS

Melodye and Gary married in 1993 and proceeded to amass a fortune of approximately $20 million from timber concerns and mineral interests. They divorced in 2010 and since then have engaged in bitter, contentious litigation over the division of their former community property estate.

In fact, this is not the first time this court has seen this case in its present posture. In 2018, Melodye appealed the trial court's finding that, under a matrimonial agreement which she attacked as invalid, the stock of a company she claimed to be her separate property was actually community property. This court affirmed the trial court[1] in *Patterson v. Patterson*, 51,929 (La. App. 2 Cir. 5/23/18), 247 So. 3d 1148. This case is before this court again with Melodye disputing the trial court's valuations of certain properties and rulings on reimbursement claims.

On October 23, 2009, Melodye filed a petition for divorce. Among other relief, she requested a partition of the community of acquets and gains. A judgment of divorce was rendered on May 7, 2010, terminating the community as of October 23, 2009.

---

[1] Judge Woodard of the Third Judicial District Court presided over the first trial.

On January 23, 2013, Melodye filed a detailed descriptive list ("DDL") and sought a judicial partition of the community of acquets and gains. Numerous motions for contempt were filed during the course of the proceedings, one of which resulted in a July 21, 2015, judgment holding Gary in contempt for diverting funds of Patterson Forestry Consultants, LLC ("PFC") for his personal use, and awarding Melodye attorney fees in the amount of $12,000.

A scheduling order was issued by the trial court on April 5, 2018, which set deadlines and referred the matter to special master Charles Traylor.

On May 18, 2018, Gary filed his DDL, and Melodye filed an amended DDL on May 21, 2018. Gary filed his traversal of Melodye's list, as well as an amended DDL, on June 18, 2018, to which Melodye filed her traversal on June 20, 2018. On August 17, 2018, Gary filed a supplemental DDL.

On April 4, 2019, the special master rendered his report, and Melodye and Gary both filed objections.

The trial on the objections took place on May 28-31, and July 9-12, 2019. The trial court took the matter under advisement and issued its reasons for ruling on March 23, 2021, addressing each item of property before it, both separate and community.

A judgment on the merits in conformity with the trial court's reasons for ruling was signed on April 25, 2023. Melodye then filed a motion for a new trial, which was denied by the trial court on September 20, 2023. Melodye now appeals.

# DISCUSSION

Melodye assigns the following errors:

1. The trial court erred in adopting the special master's recommendation based on an erroneous assumption that appellee's personal expenditures from PFC were contemplated by a prior interlocutory ruling.

2. The trial court erred in adopting the special master's recommendation as to Financial Resources Management of Louisiana, Inc. ("FRM"), which recommendation ignores substantial liabilities of the company without explanation or methodology.

3. The trial court erred in undervaluing Woodland Acres, LLC ("Woodland Acres") by applying an excessive discount without any particular methodology.

4. The trial court abused its discretion and erred in allocating a portion of the Dubach Tract to appellee based on Gary's threats of "trouble" to Melodye.

5. The trial court erred in valuing a community office building at $100,000 less than appraisal due to a minor encroachment.

6. The trial court erred in denying Melodye's reimbursement claim no. 70 for loss of rentals for a community office building caused by Gary.

7. The trial court erred in failing to add values for three community bank accounts in Gary's possession.

8. The trial court erred in failing to assign any value to marketable timber located on the Matthew Tract.

9. The trial court erred in ignoring the diminution in value in the Redd House caused by Gary's neglect.

10. The trial court erred in denying Melodye recovery for her reimbursement claims no. 61 and no. 62 when Melodye paid income taxes for FRM income that was not distributed to her.

11. The trial court erred in awarding Gary's reimbursement claim no. 3 because the payment was made with community funds.

3

12. The trial court erred in awarding Gary's reimbursement claim no. 8 because the payment was made with community funds.

13. The trial court erred in rejecting Melodye's reimbursement claim no. 16 seeking return of health insurance premium payments made by Melodye based on prior false representations of Gary.

14. The allocation of Marion State Bank Certificates of Deposit Items nos. 15, 16, 17, and 18 should be reallocated and an appropriate payment ordered to equalize the partition as between the parties.

*Standard of Review*

It is well settled that a "trial court is vested with great discretion in effecting a fair partition of community property." *Arterburn v. Arterburn*, 15-22, p. 4 (La. App. 3 Cir. 10/7/15), 176 So. 3d 1163, 1167. A trial judge "is afforded a great deal of latitude in arriving at an equitable distribution of the assets between the spouses." *Graefenstein v. Graefenstein*, 03-1077, p. 6 (La. App. 5 Cir. 1/27/04), 866 So. 2d 958, 961. Further, "[f]actual findings and credibility determinations made by the trial court in the course of valuing and allocating assets and liabilities in the partition of community property may not be set aside absent manifest error." *Politz v. Politz*, 49,242, p. 6 (La. App. 2 Cir. 9/10/14), 149 So. 3d 805, 812.

Under a manifest error standard of review, this court can only reverse if it finds, based on the entire record, that there is no reasonable factual basis for the factual finding and that the fact finder is clearly wrong. *Stobart v. State, Through DOTD*, 617 So. 2d 880 (La. 1993). Thus, this court must not reweigh the evidence or substitute its own factual findings just because it would have decided the case differently.

4

*Applicable Legal Principles*

Under Louisiana law, "[p]roperty of married persons is either community or separate." La. C.C. art. 2335. Property in the possession of a spouse during the existence of the community property regime is presumed to be community, but either spouse may rebut the presumption. La. C.C. art. 2340. Louisiana Civil Code Article 2338 defines community property as follows:

> The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property.

Louisiana Civil Code Article 2341 defines separate property as follows:

> The separate property of a spouse is his exclusively. It comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually; damages awarded to a spouse in an action for breach of contract against the other spouse or for the loss sustained as a result of fraud or bad faith in the management of community property by the other spouse; damages or other indemnity awarded to a spouse in connection with the management of his separate property; and things acquired by a spouse as a result of a voluntary partition of the community during the existence of a community property regime.

Under La. C.C. art. 2360, "[a]n obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation."

Further, La. C.C. art. 2361 states that "[e]xcept as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations."

According to La. C.C. art. 159, "[a] judgment of divorce terminates a community property regime retroactively to the date of filing of the petition in the action in which the judgment of divorce is rendered." Upon termination of the community, "[e]ach spouse owns an undivided one-half interest in former community property and its fruits and products." La. C.C. art. 2369.2.

When the spouses are unable to agree on a partition of community property or on the settlement of the claims between the spouses arising either from the matrimonial regime, or from the co-ownership of former community property following termination of the matrimonial regime, either spouse, as an incident of the action that would result in a termination of the matrimonial regime or upon termination of the matrimonial regime or thereafter, may institute a community property partition. La. R.S. 9:2801(A).

The court shall determine the community assets and liabilities; the valuation of assets shall be determined at the trial on the merits. La. R.S. 9:2801(A)(2). The court may appoint such experts pursuant to Articles 192 and 373 of the Louisiana Code of Civil Procedure as it deems proper to assist the court in the settlement of the community and partition of community property, including the classification of assets as community or separate, the appraisal of community assets, the settlement of the claims of

the parties, and the allocation of assets and liabilities to the parties. La. R.S. 9:2801(A)(3).

The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties. La. R.S. 9:2801(A)(4)(a). The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value. La. R.S. 9:2801(A)(4)(b). The court shall allocate or assign to the respective spouses all of the community assets and liabilities. La. R.S. 9:2801(A)(4)(c). In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. La. R.S. 9:2801(A)(4)(d).

In valuing and allocating assets and liabilities to partition community property, a trial court is not required to accept at face value a spouse's valuation of assets, debts, or claims against the community. *McDaniel v. McDaniel*, 35,833 (La. App. 2 Cir. 4/3/02), 813 So. 2d 1232. Absent manifest error, a trial court's factual findings and credibility determinations made in the course of valuing and allocating assets and liabilities in order to partition community property may not be set aside on appeal. *Id.* The trial court's choice of one expert's method of valuation over that of another will not be overturned unless it is manifestly erroneous. *Ellington v. Ellington*, 36,943 (La. App. 2 Cir. 3/18/03), 842 So. 2d 1160, *writ denied*, 03-1092 (La. 6/27/03), 847 So. 2d 1269.

If separate property of a spouse has been used either during the existence of the community property regime or thereafter to satisfy a

7

community obligation, that spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. La. C.C. art. 2365. The burden of proof is on the party claiming reimbursement to show that separate funds existed and were used to satisfy the community obligation. *Tippen v. Carroll*, 47,415 (La. App. 2 Cir. 9/20/12), 105 So. 3d 100.

*Valuation of PFC*

The community included PFC, a holding company allocated to Gary and valued by the special master and the trial court at $600,000. Gary was granted the right to operate PFC by order of the trial court on May 7, 2010. Melodye claims that Gary spent money that belonged to PFC without regard to the needs of the company and ran numerous personal expenses through PFC. She complains that the trial court's valuation "does not consider evidence of significant personal expenses paid for Gary by [PFC] or the artificial reduction of the valuation that results from a failure to adjust for those personal, non-business expenditures."

Melodye's expert witness, certified valuation analyst Patrick Lacour, testified at trial that PFC should have been valued at $1,048,702.[2] Mr. Lacour arrived at his value utilizing QuickBooks records of PFC, which he said required him to make adjustments for an artificial diminution in value attributable to Gary's personal expenditures from PFC. The special master acknowledged that Lacour's report provides "useful insight into the value of

---

[2] Melodye admits in her brief that Lacour made an error in this valuation by failing to reduce it by $65,000 to account for a related-party loan. Therefore, the valuation asserted by Melodye for PFC is $983,702.

the community interest in the LLC," although he concluded that certain of Lacour's adjustments were too high.

The special master stated that "[I] believe the adjustments proposed by Mr. LaCour for undocumented payments are too high as they include such payments in a period already considered by Judge Woodard and they disallow some expenses, such as CPA fees, and professional dues, which more probably than not, are appropriate." Based on these assumptions, the special master then reduced Lacour's conclusion of value by approximately $400,000.

Melodye claims that the special master's first assumption suggests that a 2015 ruling on an interlocutory motion already considered some of the questioned expenditures. She notes that the referenced ruling was for only $31,477.58, while the special master's reduction was around $400,000.

The 2015 ruling arose out of a November 2010 motion filed by Melodye requesting that Gary be held in contempt for using PFC monies for personal expenditures. The contempt motion included an exhibit detailing expenses which Melodye contended were personal expenses paid by PFC. Special Master Traylor recommended that the expenses be deemed personal and that they should be paid back to PFC. The special master also recommended that Gary be held in contempt.

Gary filed objections, and a trial on these objections was held before Judge Woodard, who rendered her 2015 judgment based on the information Melodye presented in connection with the 2010 motion. Melodye claims that additional information obtained through subsequent discovery was not considered by Judge Woodard and the $31,477.58 that was known at the

time of the contempt proceeding does not justify the special master's $400,000 reduction in the valuation of PFC.

Melodye further notes that no receipts were kept by Gary for any purported expenses of the company at any pertinent time. After the above-described contempt hearing, Melodye notes that she was eventually able to obtain QuickBooks records for PFC, which included credit card statements and invoices for 2009 through 2013.

Melodye compared the credit card statements and invoices to the QuickBooks records which she said revealed numerous expenses that lacked documentary support and were personal in nature. Melodye compiled this information and provided it, along with the QuickBooks records, to Mr. Lacour, who incorporated the information into his report and adjustments.

Melodye argues that her expert, Mr. Lacour, employed a reliable methodology to arrive at his valuation of PFC, namely an adjusted net asset value approach. She notes that the net asset value approach takes the historical book value and makes adjustments to reach the fair market value of the asset.

Melodye claims that money expended by PFC for anything other than legitimate business purposes should not reduce the value of the entity for the benefit of Gary, who controlled PFC; but, instead, that money should be considered as cash in the possession of the company and therefore added back to the company's value.

Mr. Lacour testified that he identified, with Melodye's assistance, the amount of personal expenses. He said he added the amounts back to the

value of PFC because the funds belonged to the company but were taken out of the company by Gary as personal expenditures.

Melodye submits that the judgment as to the value of PFC should be modified to reflect that PFC's value is $983,702 rather than $600,000.

Gary claims that the trial court's valuation is correct. He points out that Melodye provided Mr. Lacour with an Excel worksheet containing her entries of numerous expenses that she claimed were undocumented, and therefore personal, but she failed to provide to Mr. Lacour the underlying data from which she created this "questionable" document. Gary also notes that Mr. Lacour admitted that Melodye's spreadsheet was the only evidence he had to create a value of $1,048,702.00 for PFC.

Gary also notes Mr. Lacour's testimony regarding the difference between his valuation and that of the special master:

Q:    Okay. Now, Chuck Traylor came up with a six hundred thousand dollar ($600,000.00) value, and not a million dollar ($1,000,000.00) value. Do you recall – were you able to determine how he arrived at his six hundred thousand dollar ($600,000.00) value?

A:    He was silent on it, but I could kind of reverse engineer it and – well, I said, "Kind of" – I did reverse engineer it. And so, if you exclude the first three footnotes which are the add backs for expenses that – the first footnote is an add back for expenses without a receipt, a statement or an invoice. The second footnote is an add back for expense without a receipt, and the third footnote is an add back for expenses without a statement or invoice. I mean, some of those are – it can be any of those three. He excluded all those add backs and that's why he ended up with a value of 600 – or with a – if I do that I get very close to 600,000 so I believe that's what he did.

Gary claims that this explanation shows that Mr. Lacour had no evidence that these expenses were personal rather than business.

Gary also points out the importance of the testimony of his expert, CPA David Cole. Mr. Cole confirmed that most of the expense items added back by Mr. Lacour would have itemized as business deductions on a tax return. Mr. Cole further testified that Gary paid back $204,000 to PFC, and also personally put $348,081.18 into the company.

Finally, Gary points out that it is the trial court's ruling that plaintiff is challenging, not that of Special Master Traylor. Gary notes the significance of this because the trial court had the benefit of the testimony on these issues and decided them *de novo* based upon this evidence, even though the final result was the adoption of the finding of the special master.

Gary requests that this court uphold the trial court's valuation of PFC at $600,000.

After a thorough review of the record, we do not find the trial court's valuation of PFC at $600,000 was manifestly erroneous. The questioned expenses appear to be legitimate business expenses incurred for the benefit of PFC. Furthermore, other than a self-serving Excel spreadsheet with unsupported numbers, Melodye offered no proof that any of the expenses she is complaining about were actually personal rather than business expenses.

We find Mr. Lacour's testimony on this subject unpersuasive. Our review of his testimony reveals that Mr. Lacour did not have any personal knowledge of the nature of the transactions at issue, and he could not say one way or the other whether those expenses were business-related. Mr. Cole, on the other hand, testified that it was "blatantly obvious" that many of the complained-of expenses were business expenses. For instance, he noted

that on one of Mr. Lacour's schedules there was an entry for "David Cole" that was categorized as not an acceptable expense. Mr. Cole also testified that receipts were not always necessary and that the IRS has allowed credit card statements for audit purposes.

Furthermore, Melodye's claim that there is no methodology to support Special Master Traylor's $600,000 valuation of PFC is without merit. Mr. Lacour's methodology was actually used by both the trial court and the special master; but instead of finding as a fact that the expenses were personal, they found most were business-related as testified to by Mr. Cole. Thus, they deducted the expenses from the value under Mr. Lacour's methodology.

This assignment of error lacks merit, and we uphold the trial court's valuation of PFC at $600,000.

*Valuation of FRM*

The community also included FRM, which was allocated to Melodye. The special master and trial court valued FRM at $2,000,000, but Melodye thinks the court should have adopted Mr. Lacour's valuation of $1,556,698. Melodye notes that the FRM balance sheet shows a liability of $756,000 due to her, which Mr. Lacour considered an offset against the net value of the assets of the company in order to arrive at his value. She argues that based on the special master's report, it appears that only the assets of FRM were considered, and not its liabilities, which obviously must be considered in valuing any company.

Melodye asserts that in order to arrive at an adjusted net asset value of a company, the starting point is the company's balance sheet. The balance

sheet includes assets, liability, and equity. When there is a loan on the company's books that is owed to someone other than the company itself, that amount must be "netted out" to come up with the net asset value of the company.

Melodye argues that because FRM is a mere holding company devoid of significant cash flow, the company requires infusions of cash to pay taxes and other necessary expenses, which cash infusions must come from the shareholder(s). Melodye notes that the $756,000 debt of FRM to her is the result of such a cash infusion and that it would be unfair to ignore the valid obligation that FRM owes to her, thereby creating a windfall for Gary.

Melodye requests that the trial court's judgment be modified to reflect the corrected value of $1,556,698.

Gary argues that the trial court got it right when it ascribed a value of $2,000,000 to FRM. He notes that Mr. Lacour looked at the QuickBooks reports behind the amounts for the liability to Melodye to determine their validity. Mr. Lacour noted that Special Master Traylor may or may not have considered the liability to shareholders in getting to his value. Mr. Lacour classified FRM as a holding company due to its lack of cash flow. However, when asked about the cash coming in and out of the company, Mr. Lacour said that FRM lost money over several years, but he admitted that net income was different than cash flow and just because a company loses money does not mean it does not have cash flow.

Gary also points out that Mr. Lacour admitted he did not know that Melodye began paying herself a management fee, which only started after

14

this court affirmed that FRM is community property. He requests that this court uphold its valuation.

We find that the trial court was not manifestly erroneous in valuing FRM at $2,000,000. Mr. Lacour applied the "forced liquidation" premise to FRM, which assumes an equalization payment would be necessary by Melodye, but he did not know how much cash Gary or Melodye had available to make such a payment. He did not ask Melodye about her financial situation to determine if this was necessary.

To determine transaction costs of the immovable property in a forced liquidation scenario, Mr. Lacour was informed that it would be a 13 percent fee ($311,535) to conduct the auction to sell the property. However, he noted that if Melodye did not have to liquidate the company, then the forced liquidation premise would not be appropriate. Melodye acknowledged that Special Master Traylor did not recommend that FRM be liquidated.

We also find it significant that Melodye started paying herself a $5,000/month management fee out of FRM in July 2018 and backdated entries to January 15, 2018; she did not do that prior to 2018, and the practice started the month after this court affirmed that FRM is community property. Melodye admitted the fees would not have been included in Mr. Lacour's evaluation, and they could not have been since he testified that he was not told about them.

Accepting the valuation of FRM proposed by Melodye would require this court to ignore her self-dealing, which we cannot do. Knowing that Mr. Lacour reduced the value of the company by the booked debt to Melodye of $756,000 as a "related-party transaction," the trial court concluded that

15

$2,000,000 was the real value even using Mr. Lacour's methodology. Ample evidence supported the trial court's valuation of FRM, and we find no manifest error in it.

*Valuation of Woodland Acres*

The community owned one-third of Woodland Acres, a valuable entity that owns several assets, and which was allocated to Gary. Both Melodye and Gary objected to the value placed by the special master on the entity of $1,750,000. The trial court agreed with Melodye after hearing the evidence and increased the value to $2,060,494.90 to add back that portion of the discount applied by the special master to the cash assets of the company. Melodye, however, remains aggrieved by the trial court's valuation of this company.

The cumulative value of all of the assets of Woodland Acres was $7,440,881. The assets comprising such value included (a) over $1,000,000 in cash; (b) a 61.83 percent interest in 571 acres of land worth $5,200,000; (c) timber located on the aforementioned land worth $597,000; and (d) $2,821,304 worth of mineral interests that were producing "substantial cash flow" exceeding $91,000 per month. Melodye asserts that the community's *pro rata* portion of this value was $2,480,294.

The special master recommended a value of $1,750,000, which was modified by the trial court to $2,060,495, while Mr. Lacour testified that the value of Woodland Acres was $2,426,000 after applying a discount to the appraised value of one of the assets of the company.

Marc Taylor was admitted as a "general certified real estate appraiser" expert without objection and provided an appraisal valuing the entire land

tract. The timber value was based on an appraisal obtained from Mark Preaus. Expert petroleum engineer Robert McGowen provided the value for the mineral interest owned by Woodland Acres. Mr. Lacour provided a unified valuation report for the entity based on the resulting asset values.

Melodye argues that the special master's recommended value of $1,750,000 should be disregarded. She asserts that the trial court assumed that the special master had reduced all asset values by 30 percent and then increased the recommended value by exactly 30 percent of the cash, or by $310,494.90, to a revised total of $2,060,494.90. In doing so, Melodye contends that the trial court "made an assumption as to a mysterious reduction" applied by the special master when the record does not divulge any methodology used by the special master to achieve his recommended value. Consequently, she argues that it is manifest error to base a value on either the special master's recommendation or the trial court's attempt to "patch" same.

Mr. Lacour explained that he applied a net asset value methodology and that "[t]here's no reason that an investor would ever seek less than the net asset value of this company. It forms what we call 'floor'." Mr. Lacour said that, unlike financial accounting's use of "book value," it is appropriate to use "market value" for a business valuation. Thus, his report and opinion took the historical book value of the entity assets and then adjusted each to fair market value.

Mr. Lacour considered numerous criteria to determine whether a discount was appropriate. He explained that a "forced liquidation" approach was not appropriate since Woodland Acres enjoyed significant cash flow;

and it was, therefore, not necessary to send the property to auction or apply transaction costs that would be attendant thereto. Based on the characteristics of the Woodland Acres land, Mr. Lacour opined that a five percent discount was appropriate, which adjusted the "recast" land value at $3,054,000 instead of $3,215,000. Application of his discount yields a total entity value of $7,280,000, making the adjusted net asset value of the community's portion $2,426,000.

Melodye asserts that even after the trial court corrected an obvious error in the discounting of the value of Woodland Acres' cash, the value determined by the trial court was still $365,505 lower than the value suggested by her expert. She argues that the trial court's valuation was not supported by the record and requests that this court reverse the trial court's finding as to the value of Woodland Acres and, instead, assign a value of $2,426,000.

Gary argues that the trial court made the appropriate adjustment to the special master's valuation. He notes several problems with Mr. Taylor's real estate valuation, including the fact that he did not apply a marketability discount for the undivided interest in the property, although he admitted it would be appropriate to do so, and that he applied the highest and best use of residential development on 100 acres of the property but admitted that it could only be done if the EPA would allow a pond to be built there. Gary also claims that Mr. Taylor's appraisal placed twice as much weight on the last similar comparable sale.

Gary pointed out Mr. McGowan's report on the mineral interest value was rejected by the special master as speculative. In attempting to add a

18

$2,000,000 mineral value to the property, Gary argues that Mr. McGowan failed to look at any comparable sales of such interests. He only looked at a revenue ledger from January to June 2018. He admitted that one of the wells he included did not start production until May 2018, so he just averaged the actual production of the other two wells to add to his baseline production numbers used to calculate estimated future production. He based his estimated value on a 25 percent royalty interest for the company but admitted that the one lease he got that number from did not cover the entire acreage upon which there was production.

Gary also notes that Mr. McGowan assumed an expense-free royalty but admitted he did not know whether that was correct. He admitted that future pricing is subject to change based upon government regulations or deregulations or political implications. He also admitted that commodities such as oil are volatile, and there is nothing static about future prices, especially in the oil and gas industry. He had no idea if a shut-in royalty payment might apply to any of the wells. He had no idea if the cost of fuel could affect the ultimate price received and paid. Gary asserts that Mr. McGowan essentially admitted to the speculative nature of his own valuation.

Gary notes that Mr. Lacour's unified valuation relied on Mr. McGowan's and Mr. Taylor's flawed valuations. Gary also points out that Mr. Lacour never held a professional license in the State of Louisiana and that he admitted failing the CPA exam when he took it.

Gary argues that the special master was able to spot the inherent speculation in Melodye's expert's opinions when setting the value. Gary

also asserts that the trial court properly adjusted that value based upon the evidence at trial for the discount the special master applied to the company cash. Accordingly, Gary requests that this court uphold the trial court's valuation of the community's interest in Woodland Acres at $2,060,494.90.

If the community asset to be valued is an interest in a partnership or corporation, the court must be careful to value the interest, not just the assets of the business entity. *Rao v. Rao*, 05-0059 (La. App. 1 Cir. 11/4/05), 927 So. 2d 356, *writ denied*, 05-2453 (La. 3/24/06), 925 So. 2d 1232; *Moody v. Moody*, 622 So. 2d 1381 (La. App. 1 Cir. 1993), *writ denied*, 629 So. 2d 1168 (La. 1993). The trial court's determination of the value of a community business is a factual one which will not be disturbed absent manifest error. *Monje v. Monje*, 94-622 (La. App. 5 Cir. 12/28/94), 648 So. 2d 1086; *Moody, supra*. A court, in valuing a community asset, has discretion. *Hare v. Hodgins*, 586 So. 2d 118 (La. 1991).

Here, Mr. Lacour's valuation of Woodland Acres was inherently flawed and the trial court was within its discretion to reject it. Mr. Lacour admitted that he never went to the property, he applied no discount for the speculative mineral valuation and deducted no amounts for transaction costs of a potential sale of the interest. Mr. Lacour also applied no discount for the timber but admitted that Woodland Acres would need permission from the co-owner of the property to cut timber and, for that matter, to lease the property for mineral production. Finally, even though he applied no appropriate discounts, every adjustment he made for Woodland Acres was positive and increased his valuation.

20

The trial court heard this evidence and realized the obvious flaws in Mr. Lacour's analysis. The Taylor appraisal was also flawed because it placed twice as much weight on the least similar "comparable sale." Appropriate discounts were not taken. The McGowan valuation lacked all the sufficient reliable information even assuming it is possible to value minerals in the ground with any legal sufficiency. Mr. McGowan used many assumptions rather than relying on the actual production, payment, and royalty information. In our view, excessive assumptions about an inherently volatile market such as oil and gas make for unsound valuation.

The special master recognized this speculation and rejected it in setting the value. The trial court properly adjusted the value based upon the evidence at trial for the discount the special master applied to the company cash, which was within its broad discretion.

We find no abuse of discretion in the trial court's valuation of the community's interest in Woodland Acres.

*The Dubach Tract*

The community further included a tract of land which was identified as the "Dubach Tract" and on which Melodye's home rests. Most of the Dubach Tract was allocated to Melodye because she had continuously resided in the home located on the land for 11 years prior to the trial.

The Dubach Tract was the source of significant tension between the parties, with Gary threatening "trouble" for Melodye if she were to be allocated any of the tract. The trial court allocated a portion of the Dubach Tract to Gary, making Gary and Melodye permanent neighbors. The trial court expressly stated the reason for this allocation: "the Court is convinced

that the division of the Dubach tract in the manner proposed … will decrease the animosity between these parties." Melodye begs to differ. She claims that the partial allocation of the Dubach Tract to Gary will have the opposite effect. She asserts that the trial court should have allocated the entire tract to her to keep them apart.

Melodye also argues that because Gary was allocated other extremely valuable immovable property in its entirety, the allocation of the Dubach Tract to her would simply result in a smaller apportionment of former community funds to her.

Melodye contends that the trial court's allocation of part of the Dubach Tract to Gary fails to either effect an equitable division of assets or to disentangle two openly hostile parties so that they may successfully go on to lead separate lives. More particularly, she asserts that this allocation is unnecessary and unfairly partitions part of Melodye's home while "almost literally keeping Gary in her back yard so that he may continue to be a source of consternation for her." Melodye claims that this arbitrary allocation will only lead to new, potentially more rancorous conflicts between the parties that would otherwise have been completely avoidable. She therefore requests this court reverse the trial court and allocate to her the Dubach Tract in its entirety.

Gary argues that this complaint by Melodye is meritless. He points out that the trial court awarded Melodye 849 acres of this tract and Gary the other 148.6 acres. This meant that Melodye got the vast majority of the property and the portion where the house is located.

Gary also points out that his undisputed testimony at trial confirmed that there were numerous ways to divide the Dubach Tract. He notes that for the last ten years Melodye was on the east side of Bayou D'Arbonne, and he was on the west side.

Gary further notes that he was awarded the small acreage (148.6 acres) south and west of Bayou D'Arbonne and Highway 151, while Melodye was given the much larger tract (849 acres) north and east of these clear dividing lines. Gary argues that this division was clearly within the trial court's discretion and should be upheld.

La. R.S. 9:2801(4)(c) provides in relevant part:

> The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant.

We agree with the trial court's division of the Dubach Tract. While one reason for allocating the property in this manner was the trial court's hope that it would reduce animosity between the parties, numerous other factors were considered, including:

1. It was Melodye's home for 11 years;

2. She oversaw the home's construction;

3. Gary bought the tract because it had a common boundary with a tract of a separate company he and his family owned, JJP Timberland, LLC f/k/a JJP Family Limited Partnership ("JJP");

4. The common boundary with JJP is over two miles long;

5. It gave JJP frontage on Highway 151 and enabled it to haul timber and access the tract of JJP;

23

6. Both parties wanted the Dubach Tract;

7. The tract was easily divisible with a clear dividing line; and

8. The court thought that allocation to either party would be inequitable under these circumstances.

In his testimony, Gary described all the existing boundaries that made the property easily divisible between them in kind, including Bayou D'Arbonne, Highway 151, pipelines, and powerlines. Faced with these considerations, the trial court fashioned an equitable division between the parties by giving each a portion with a clear dividing line.

We find no abuse of the trial court's vast discretion in its division of the Dubach Tract.

*The PFC Office Building*

The office building occupied by PFC was allocated to Gary. Because the special master thought that only a tiny portion of the community office building was located on community land, he valued it at $100,000. However, the trial court found, based on the trial testimony of expert land surveyor James Michael Duty, that 99.065 percent of the office building does not lie on the neighboring property but, rather, sits on community property. The trial court increased the special master's valuation by $45,000 to $145,000.

Melodye claims that the value should have been $245,000, which is the value her expert Mr. Taylor gave. Melodye asserts that a $100,000 reduction under these circumstances is a clear abuse of discretion. She notes that 99.065 percent of the office building lies within the boundaries of the

community property, which is also taxed to the community according to the parish tax assessor's records.

Melodye also points out that Gary elected soon after the October 23, 2009, divorce petition to move this property into a family limited partnership owned by himself, and shortly thereafter he donated it to his children.

Melodye argues that even if the encroachment was on a stranger's property, it would not warrant a $100,000 reduction in its value. Melodye also notes that the trial court justified allocation of a portion of the much larger Dubach Tract to Gary because it would give him ownership of property next to his children.

Melodye submits that the community office building should be valued based on the evidence at the appraised value of $245,000. She therefore requests that the trial court's valuation be reversed and modified accordingly.

Gary takes issue with the trial court's ruling that the office building is located on community property but agrees with the trial court's valuation of the building at $145,000. In support, Gary points to the following testimony from trial.

Gary testified that he and his ex-wife, Pam Gulledge, purchased land he calls the Garr Tract of 13.3 acres in 1979 from Mary Lou Garr McCollins. He got the Garr Tract in the divorce and reserved it as separate property before his marriage to plaintiff. He and Melodye owned a five-acre adjacent tract which Gary bought from his brother before he purchased the Garr Tract. Melodye and Gary resided on the tract and ultimately sold 4.3 acres to Jace Patterson, Gary's son. They kept .7 acres on the western

25

boundary of the building as access and parking for the PFC office building. The western boundary of the Garr Tract where the building sits meets the eastern boundary of the .7 acres.

Mr. Taylor valued the PFC office and .7 acres at $245,000, $8,500 of which constituted the value of the land. Gary notes that Mr. Taylor made an "extraordinary assumption" in his appraisal that the PFC office building was located on the community .7 acres. Gary argues that Mr. Taylor did not attempt to make any independent determination as to whether it was located on the .7 acres.

Gary claims that the heart of the issue on this item concerns the survey by Mr. Duty. Gary notes that Mr. Duty did not make a survey of the .7 acres at issue and did not have a survey of that tract. He admitted that a boundary line and property line are two different things, and the boundary line and property line here may be in two different places. Mr. Duty determined the northwest corner of section 26 based on a conversation with Romie McMurray, now deceased, in 1981. Mr. Duty testified that the general land office deputy surveyor's survey measured the south line of section 26, which helped fix the boundary at issue, and it was 66 feet different from his own; thus, he believes the general land office made a 66-foot error. Mr. Duty's survey was entered into the record.

Gary testified about why the boundary line drawn by Mr. Duty between the .7 acres and JJP property is incorrect. He provided a drawing of the property lines at issue that he made in the late 1970s or early 1980s. A surveyor named Lemke did the original survey in 1977. He established the northwest corner of the original five acres and tract 1 of the Garr Tract.

Gary said he was there when Lemke did the survey and saw him put the pin down in the northwest corner of tract 1 and the northeast corner of the five-acre tract. Gary said he painted the line, and the line was painted three times since 1977. He understood that Melodye's experts did not establish a line but put a line where they determined the west boundary of the Garr Tract should be according to their information; this moved the line 66 feet east of the possession line established in 1977. Gary provided an April 23, 2019, survey, and that survey coincided with the 1977 survey by Lemke. He also provided photos of the pin from the 2019 survey, which is consistent with the 1977 survey.

Based on this and other factors, Gary claims that the PFC office building was not located on the .7 acres of community property. He asserts that Mr. Taylor's appraisal is clearly flawed and based on an extraordinary assumption not supported by the record evidence which required his value to be adjusted downward. Gary asserts that Mr. Duty's report is almost entirely based on a conversation with Romie McMurray that took place in 1981 and ignores the creation of the section line and corner created by the government land office survey, which is not correctable as a matter of law even if it is incorrect. Gary also claims that Mr. Duty's report and testimony is inconsistent with the 1977 survey and the 2019 survey and possession of the property by Gary and his ancestors in title. For these reasons, Gary asserts that the value determined by the court of $145,000 is supported by the evidence and clearly within the trial court's great discretion.

In light of the discretion granted to the trial court by La. R.S. 9:2801, the trial court is not required to accept at face value a party's valuation of

assets, debts, or claims against the community. *McDonald v. McDonald*, 40,035 (La. App. 2 Cir. 8/17/05), 909 So. 2d 694. If the trial court's valuations are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed. *Id.*

We find that the trial court's valuation of the PFC office building at $145,000 was reasonably supported by the record. The $245,000 value given by Melodye's expert, Mr. Taylor, appears to be significantly inflated and a reduction was warranted. The trial court was well within its discretion in reducing the value by $100,000 to $145,000.

*Melodye's Claim for Rent on PFC Office Building*

Through her claim #70, Melodye sought reimbursement for one-half rent due on the PFC office building. She contends that during the marriage PFC paid rent of $12,000 per year to the parties for its use of the PFC office building located at 629 Leachman Road in Ruston, Louisiana. She further contends that after the parties split up in 2009, PFC discontinued paying rent to the parties. Melodye testified that $125,000 was owed in past-due rent, and that she seeks reimbursement for one-half of that amount, or $62,500. Thus, Melodye requests this court to increase the amount allocated to her out of the Marion State Bank Certificates of Deposit by $62,500.

Gary argues that the trial court was correct in adopting the special master's finding that an LLC is a separate legal entity from the parties. A limited liability company is a separate legal entity from its members. *Glod vs. Baker* 02-988 (La. App. 3 Cir. 8/6/03), 851 So. 2d 1255, *writ denied*, 03-2482 (La. 11/26/03), 860 So. 2d 1135. La. R.S. 12:1329 states in pertinent part: "[a] member [of an L.L.C.] shall have no interest in limited liability

28

company property." Thus, members of a limited liability company have no right to sue personally for damages to limited liability company property. La. R.S. 12:1320(B); *Zeigler v. Hous. Auth. of New Orleans*, 12-1168 (La. App. 4 Cir. 4/24/13), 118 So. 3d 442.

Here, if the LLC owes rent, Melodye's claim is against the LLC and not Gary individually. Moreover, the failure of the LLC to pay rent would operate to inflate the value of the LLC and the community interest in the LLC thereby protecting all parties from any loss of value due to the failure to pay rent. Accordingly, we uphold the trial court's finding on this issue.

*Valuation of Community Bank Accounts*

Melodye also complains about the trial court's placing a zero balance on three bank accounts that total $63,415.57. These include Asset no. 8 (Bancorp South Bank Account xxx8648-3) with a balance of $1,181.35; Asset no. 9 (Bancorp South Bank Account xxx8639-2) with a balance of $54,210.86; and Asset no. 10 (Community Trust Bank Account xxx7489) with a balance of $8,023.36.

Melodye argues that Gary was in control of these assets immediately after the date of termination of the community. She claims to have no knowledge of what happened to these funds and asserts that Gary failed and refused to provide documentation or any other information to explain the disappearance of these funds. The special master noted that the current records of these accounts were under Gary's control. Thus, Melodye asserts that there is no evidence to support valuation of these three accounts at $0. Melodye requests this court to reverse the trial court and allocate the bank accounts in question to Gary at the values set forth above.

Gary argues that the trial court was correct at placing a zero balance on each of these three accounts. As for Asset no. 8, Gary pointed to the testimony of expert accountant Mr. Cole. Mr. Cole testified this account was closed on September 19, 2012. He noted there were some transfers of money to another community account (Asset no. 9) because one account did not have checks, but the money was transferred back to this account each time. When the account was closed, Mr. Cole testified that it had a balance of $212.69.

Gary notes that the evidence regarding Asset no. 9, the other Bancorp South account, is similar. Melodye was listed as an owner of the account. She did not know for sure if it was still open. Mr. Cole testified that after the divorce, any monies transferred from the account were to other community accounts, and the final balance of the account ($257.30) was transferred to a community account. Mr. Cole testified that the account was closed.

Finally, as for Asset no. 10, Gary notes that Melodye was listed on the account and would, therefore, have had just as much access to it as Gary. Gary points out that Mr. Cole testified that this account was closed on May 8, 2013.

The spouse alleging improper management bears the burden of proving that her former spouse failed to manage and prudently preserve the former community property prior to partition. *Reagan v. Reagan*, 52,080 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1122. Comment (c) to La. C.C. art. 2369.3 provides that a spouse who asserts a claim under this article is required to prove that the other spouse failed to act prudently in a manner

consistent with the mode of use of the property under his control immediately prior to termination of the regime, not simply that he had former community property under his control. *Id.*

Here, since the only proof offered at trial was that each of the accounts had zero balances and that Melodye had some control over all three, we hold that the trial court was within its discretion in valuing the accounts at $0.

*Valuation of the Matthew Tract*

Melodye asserts that the trial court erroneously valued a tract of immovable property, referred to as the "Matthew Tract," without adding the value of the timber on the property. Melodye argues that the Matthew Tract had a timber value of $39,378 that is not disputed with any competent evidence, yet the value assigned by the special master and adopted by the trial court does not account for this value. Melodye argues that the assigned value should be increased to account for the timber value, which was not included in the appraised value adopted by the trial court.

Melodye notes that the expert opinion of Mr. Taylor established a value of the land – without its timber – at $88,000. She further points to Mr. Taylor's testimony that the value of the land with its $39,378 worth of timber was $127,378.

Melodye requests that this court reverse the trial court so as to reflect the correct value of the Matthew Tract at $127,378.

Gary asserts that the trial court's valuation of the Matthew Tract should not be disturbed on appeal. He notes that this 33-acre landlocked tract is almost 2,000 feet off a public road and is only accessible by ATV

during the wet periods of the year. Gary disputes Melodye's characterization of Mr. Taylor's testimony. Gary claims that Mr. Taylor did not testify that the total value of the Matthew Tract is $127,378. Rather, "what he did say is that if you value the timber separately … and you add that number to his appraised value for the property with the timber on it, you come up with that total." While Gary still takes issue with the $88,000 appraisal on this tract and the trial court's $100,000 valuation, "there is simply no basis to overturn the trial judge's valuation on this property."

We note that the value now advanced by Melodye, $127,378, exceeds the value listed in her detailed descriptive list ($99,990) by more than 25 percent and is more than triple the value originally listed by Gary ($40,000). The tract of land at issue has no road frontage and the appraiser noted that it is poorly suited for urban development or recreational use.

Considering all of the available information, we agree with the special master and the trial court that the value currently advanced by Melodye is too high and the value originally listed by Gary was too low. Accordingly, we find no abuse of discretion in the trial court's valuation of this property at $100,000.

*Valuation of the Redd House*

The "Redd House" is a community asset rental home that was allocated to Gary with a value of $40,500. This was the value assigned by the special master and adopted by the trial court and it represented the average of the two appraisals presented in evidence. Melodye argues that Gary neglected the Redd House, which resulted in a loss in value of this community asset.

Melodye notes that the house was allocated to Gary at a value $26,500 less than his own 2019 appraisal. She argues that the value of the Redd House should be increased by $26,500 to an amount equal to the $67,000 appraisal submitted by his own expert, Mr. Addison.

Melodye points out that while the appraisal describes the property's condition as "below average," it specifically states that "[t]he overall condition is acceptable and consistent with that typically found within the immediate neighborhood."

Melodye notes Gary's testimony that in cleaning up after tenants were evicted, he discovered mold in the attic and then, because Melodye allegedly would not pay for the repair work, "[Gary] said, 'shut her down.'"

Melodye claims that access to the Redd House was controlled by a locked gate and Gary controlled the combination. Melodye asserts that while under Gary's control, the Redd House deteriorated so much by the time of trial that Gary acknowledged the condition of the Redd House as "deplorable," explaining that the "roof is pretty much gone." Melodye argues that the house's deplorable condition caused the property, which was previously valued by Gary's personal opinion at $50,000 and then by Gary's appraiser at $67,000, to be worth much less.

Melodye argues that the trial court's judgment should be modified to increase the value of the Redd House to $67,000, or, alternatively, to award her $13,250 on her reimbursement claim #35, representing one-half of the damage caused by Gary's neglect.

Gary argues that the trial court was correct in its valuation of the Redd House. He notes that the evidence at trial showed that the house sits right in

the middle of a tract that JPP owns and that much of the Redd House yard is on the JPP tract itself. Gary testified that the Redd House is in deplorable condition and that it will take more than what the property is worth to repair it. Gary notes that Melodye agreed with this assessment. Gary also notes that the house was previously rented, but Gary evicted the tenants because they would not pay rent, and the property had become a mess. He tried to get it cleaned up, but then mold was found in the walls, and Melodye would not agree to contribute to the repair work.

Gary also points out that Melodye's own expert, Mr. Taylor, valued the Redd House at $14,000. He visited the property and noted it as being in a state of disrepair. Gary argues that despite this, special master Traylor valued the property at $40,500. Gary argues that Melodye now wants to increase her take of the community by increasing the value of this property to $67,000 "in spite of the fact that she did not want to contribute to the repair of the property."

We find no manifest error in the trial court's valuation of the Redd House. Mr. Taylor's appraisal states the condition of the property is "fair," while Mr. Addison's appraisal describes the condition of the property as "below average." Photographs attached to Mr. Addison's appraisal show damage to the ceiling and roof. The comparable sales used by Mr. Taylor were of properties in similar condition. Mr. Addison's comparable sales were of properties in better condition, but he adjusted his final valuation accordingly.

A court may accept parts of the valuation elements of opposing experts thereby creating a hybridized evaluation. *Bulloch v. Bulloch*, 51,146

(La. App. 2 Cir. 1/18/17), 214 So. 3d 930, *writ denied*, 17-0348 (La. 4/13/17), 218 So. 3d 629.

Based on our review of the record, we cannot say that the trial court abused its discretion in adopting the special master's recommendation that the Redd House be valued at the average of the two appraisals, $40,500.

*Melodye's Reimbursement Claim for Income Tax Payments*

Melodye argues that she fully paid the taxes for co-owned income received by a community entity, FRM, and should be reimbursed for her payment. She notes that the total tax attributed to her for FRM income was $84,817.75 and that she should be awarded reimbursement equal to one-half of that amount, $42,408.

Melodye points out that in the previous appeal, FRM was determined to be a community asset with Melodye as the sole shareholder. *See Patterson v. Patterson*, *supra*. Thus, Melodye received a K-1 issued 100 percent to her. Despite the fact that neither Gary nor Melodye received any distributions on the money at issue, Melodye claims that she paid one hundred percent of the taxes.

Gary argues that the trial court properly denied these reimbursement claims. He points to the testimony of Melodye's expert Mr. Cole. Mr. Cole testified that there is no way to know how much tax Melodye actually paid. Gary also notes that Melodye offered no proof of what she or FRM allegedly paid.

We find that Melodye offered insufficient proof of the amount of income tax she allegedly paid. However, even assuming she paid $85,000 in income tax, she offered no proof whatsoever that the income on which she

35

allegedly paid the taxes was ever distributed to Gary. We agree with the special master that Melodye effectively retained income belonging to Gary and used those funds to pay income tax on the income which also belonged one-half to him. Under these circumstances, we find no abuse of the trial court's discretion in its denial of these reimbursement claims by Melodye.

*Gary's Reimbursement Claim No. 3*

Gary was awarded reimbursement of $4,250 for one-half of payments made to a community entity, FRM, in the amount of $8,500. Melodye argues that the funds used to pay the sum in question were derived from the sale of a duplex that Gary incorrectly claimed was his separate property.

Melodye avers that 50 percent of the duplex was community in nature, and all of the funds were commingled with community funds into an account from which the payment was made. Melodye argues that Gary failed to adequately trace any separate funds as would be required to prove his right to reimbursement. She requests that this court reverse the trial court's judgment awarding Gary this reimbursement claim.

Gary argues that the trial court properly granted his reimbursement claim because it involved the use of separate funds to pay a debt of a community company. Gary claims that prior to the marriage, he owned a duplex in Winter Park, Colorado, with his first wife, Pam Gulledge. Gary specifically reserved the duplex as his separate property in the matrimonial agreement entered into by the parties. On March 12, 2001, Gary sold the duplex for $365,000. After the various expenses associated with the sale, the balance due to him was $338,865. Gary claims that the money from this sale (which remained his separate property) was wired to a joint checking

36

account on March 26, 2001. In March 2001, eight checks were written from that joint account. Claim no. 3 represents one of the checks that Melodye wrote from the joint checking account to satisfy an FRM debt. The effective source of this payment was the $338,865 from Gary's separate funds from the sale of the duplex.

Accordingly, Gary argues that the trial court was well within its discretion in awarding him reimbursement for payments from his separate funds to satisfy a community obligation.

Property of married persons is either community or separate, except as provided by Article 2341.1. La. C.C. art. 2335. The classification of property as either separate or community is fixed at the time of its acquisition. *Mabray v. McSherry*, 54,022 (La. App. 2 Cir. 8/11/21), 325 So. 3d 1157, 1165, *writ denied,* 21-01498 (La. 12/21/21), 329 So. 3d 828. Things in possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove by a preponderance of the evidence that they are separate property. La. C.C. art. 2340; *Talbot v. Talbot*, 03-0814 (La. 12/12/03), 864 So. 2d 590; *In re Succession of Holcomb*, 47,979 (La. App. 2 Cir. 5/29/13), 117 So. 3d 264, *writ denied*, 13-1537 (La. 10/4/13), 122 So. 3d 1023.

We note that a trial exhibit contained an itemization of the payments prepared by Melodye and confirmed the source and purpose of the payments. Melodye admitted that this document was in her handwriting and her notes indicated payments of community lines of credit with Gary's separate money.

37

We find that Gary offered sufficient proof that his separate property was used to pay a community debt. Accordingly, we find no manifest error in the trial court's ruling that he is entitled to reimbursement of $4,250, representing one half of the amount paid.

*Gary's Reimbursement Claim No. 8*

Melodye makes the same argument in this assignment of error as in her previous one. Here, a portion of the same duplex proceeds that she claims were community were also used by Melodye for attorney fees incurred for the benefit of the community.

Melodye again asserts that the funds from which this payment was made were derived from the sale of property in which the community had 50 percent ownership. She claims that the funds were commingled with community funds in a community account, and Gary failed to adequately trace any separate funds as would be required to carry his burden of proving that separate funds were used to make the payment for which he seeks reimbursement. Melodye requests that this court reverse the trial court's judgment granting Gary's reimbursement claim no. 8.

Gary argues that the trial court correctly awarded his reimbursement claim no. 8 just as it did with his reimbursement claim no. 3. He notes that his reimbursement claim no. 8 is based upon Check No. 7204 for $27,751.87, dated March 28, 2001, written to James H. Blanchard and signed by Melodye to pay for legal fees that were a community obligation. Gary avers that the check bears a notation "1/2 legal fees Aders Tract." Gary claims the check was written to pay legal fees incurred with respect to litigation concerning recompletion of a well on the "Aders Tract." He

38

testified the litigation was unsuccessful. Gary asserts that his testimony linked the payment to attorney fees incurred during the marriage. As such, Gary argues that the debt was presumed community and that he was allowed reimbursement in the amount of $13,876, representing one-half of the separate funds used. Accordingly, Gary asserts that the trial court's adoption of the special master's granting of his reimbursement claim was correct.

Legal fees incurred during a marriage are a community obligation. The use of Gary's separate property to pay such legal fees entitled him to reimbursement equal to one-half of the amount paid. Accordingly, for the same reason we affirmed the trial court's ruling on Gary's reimbursement claim no. 3, we affirm the trial court's ruling on Gary's reimbursement claim no. 8.

*Melodye's Reimbursement Claim for Health Care Premiums*

Through her claim no. 16, Melodye seeks reimbursement for health care premiums reimbursed to Gary that were actually paid by PFC. She asserts that she paid Gary a portion of health insurance premiums pursuant to a prior trial court order in this matter. Melodye asserts that she has now discovered that PFC paid the health care premiums rather than Gary; thus, she should be reimbursed for the $2,373.25 she paid to Gary.

Melodye asserts that the adoption by the trial court of the special master's recommendation on this issue should be reversed and her reimbursement claim no. 16 should be granted in the amount of $2,373.25.

Gary asserts that the trial court properly denied Melodye's reimbursement claim. He notes that the transaction on which this claim is

based occurred in October 2010, more than a year after the community terminated.

We note that Melodye relies entirely on her own testimony to attempt to prove that only community funds were used, which is insufficient under the jurisprudence to prove the nature of the funds used. *See e.g. Licciardi v. Licciardi*, 16-289 (La. App. 5 Cir. 12/7/16), 207 So. 3d 638, *writ denied*, 17-0015 (La. 2/10/17), 210 So. 3d 797. Furthermore, we agree with the special master and the trial court that Melodye's claim appears to be for payment of a thing not due rather than a reimbursement claim related to the community. Accordingly, we find that the trial court did not abuse its discretion in denying Melodye's reimbursement claim no. 16.

*Marion State Bank Certificates of Deposit*

Four large Marion State Bank certificates of deposit (Asset Items nos. 15, 16, 17, and 18) were allocated by the trial court. Assets nos. 15, 16, and 18 were apportioned between the parties as follows: $265,752.23 to Gary and $2,606,641.71 to Melodye. Asset no. 17 was allocated entirely to Gary.

Melodye argues that this court should reallocate the certificates of deposit to equalize the partition between the parties, and to the extent the funds are inadequate, an appropriate equalization payment is required.

Because we find that all of the issues raised on appeal were decided correctly and within the trial court's discretion, we hold that the equalizing payment should remain the same.

**CONCLUSION**

For the foregoing reasons, the trial court's rulings are affirmed. All costs of this appeal are assessed to appellant.

**AFFIRMED.**